Gilbert Diamond STERRY, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–95–00846–CR.

Court of Appeals of Texas,
Dallas.

April 23, 1997.

Donald R. Scoggins, Charles W. Tessmer, Dallas, for Appellant.

Pamela Sullivan Berdanier, Assistant District Attorney, Dallas, for State.

Before CHAPMAN, WHITTINGTON and WRIGHT, JJ.

## OPINION ON MOTION FOR REHEARING

WRIGHT, Judge.

We grant appellant's motion for rehearing. We withdraw our opinion and judgment of December 31, 1996. The following is now the opinion of this Court.

Gilbert Diamond Sterry appeals his conviction for assault. After the jury convicted appellant, visiting Judge Chuck Miller found the offense was committed because of bias or prejudice (a "hate crime finding") and assessed punishment at seven years' confinement. In nine points of error, appellant contends: (1) the evidence is insufficient to support the hate crime finding; (2) the jury should have determined the hate crime finding; (3) the evidence is insufficient to dis-

prove self-defense; (4) the trial judge's statement about the applicable law misled appellant into changing his punishment election; (5) appellant should have been punished for a state jail felony; (6) the State failed to give notice of its punishment evidence; (7) article 42.015 of the Texas Code of Criminal Procedure (the "Texas Hate Crime Statute") is void for vagueness under both the state and federal constitutions; and (8) the trial judge erred by denying him access to the victim impact statement prior to sentencing. We reverse the trial court's judgment and remand for a new punishment hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant was tried with his three co-defendants: John Nesbitt, Malcom Woody, and Don Woody. Each defendant was charged with aggravated assault arising out of the same incident.

Ronnie Lee McCarty testified that he and his wife, Patricia Brandon McCarty (McCarty's wife), were going out to dinner to celebrate their anniversary. As they approached the restaurant, McCarty noticed the car in front of him swerve to avoid a wheelbarrow and shovels in the road. He pulled into the restaurant parking lot and parked his car. He intended to get the wheelbarrow and put it into the trunk of his car. As McCarty was making space for the wheelbarrow in the trunk, a car pulled up behind him blocking him in. Appellant and John Nesbitt were in the car.[1] Malcom Woody and Don Woody came from the nearby pool hall and joined them. Appellant said, "Hey." McCarty did not answer, so appellant said, "Hey, boy, I'm talking to you." When McCarty looked at him, appellant said, "Yes, I'm talking to you. You're looking for trouble, aren't you? You're looking for trouble and you just found some." Appellant gestured at McCarty and McCarty started to approach the car. Appellant and Nesbitt came around the car "closing in on [him]." McCarty began to back away. All four men began to approach

him, and appellant told McCarty, "Boy, you're going to get an ass whipping." Appellant called McCarty a "nigger" once or twice. Don kicked McCarty in the stomach. As Don kicked McCarty, McCarty took his pocketknife out of his pocket and swung at Don. In an attempt to bluff the men, McCarty then yelled to his wife to get his gun. Don backed away and picked up a shovel. Appellant then said, "Nigger, we're going to kill you." McCarty threw his knife into the street and picked up the other shovel to defend himself. McCarty used his shovel to block the shovel blows from Don. McCarty was backing away from the four men when he ran into a car. When he backed into the car, the four men rushed him. McCarty remembers someone saying, "Hit him, hit him," and a man saying, "Get up off of him, you're going to kill him." He remembers being hit on the head and neck. McCarty went to the hospital and received thirteen staples in his scalp for a large cut on the back of his head. McCarty identified appellant, John Nesbitt, Malcom Woody, and Don Woody as the four men who assaulted him.

McCarty's wife testified that on the night of the assault, she and her husband were going out to dinner to celebrate their anniversary. They decided to go to Rafael's. As McCarty pulled into the parking lot, he told his wife he was going to get a wheelbarrow out of the road before someone hit it. He parked the car and got out to get the wheelbarrow. McCarty's wife stayed in the car. She heard cursing and yelling. Someone shouted, "Hey, hey, hey boy." She looked back and saw a car blocking her car. Four men were approaching McCarty, and she realized the shouting and cursing had been directed at her husband. McCarty's wife got out of the car and pulled on one of the men's sleeve telling him to leave McCarty alone. The man pushed her, and she stumbled backwards. The men began to scuffle, and someone shouted, "He's got a knife." They began fighting with the shovels that had been lying near the wheelbarrow. During the fight, her husband told her to get back in the car and asked her to "get the gun." McCarty's wife

---

1. McCarty and his wife did not use names when identifying the men. Although it is not always clear from the record which of the men they were testifying about, we have attempted to use names when possible.

knew there was no gun in the car. The men got McCarty on the ground and were kicking him and hitting him with the shovel. One of the men was on top of McCarty, who was lying face down in the parking lot, disoriented and bleeding.

A man came out of the nearby pool hall and grabbed the man beating McCarty. He told the man beating McCarty to stop because he was going to kill McCarty. The man beating McCarty shouted, "Fuck that nigger." The man from the pool hall managed to get the shovel away from the man on top of McCarty and pulled him away from McCarty. McCarty's wife went to check on McCarty. McCarty told her to call the police. She called the police from her car phone. She wrote down the license plate on the men's car and gave it to the police. The men left in their car before the police arrived. As the men drove away, they told her, "You have not seen the last of us. This is not over." She later identified appellant, Malcom Woody, and Nesbitt. She could not positively identify Don Woody.

Lisa Whitley, the general manager of Speed's Billiards and Pool Hall, testified that she was the manager on duty the night of the assault. A woman ran into the pool hall and told Whitley to call 911 because there was a fight in the parking lot. Ron Wood, the bartender, called the police.[2] Whitley went outside to the parking lot. Several of the customers in the pool hall also went outside. One of the customers, Steve Pearce, was in front of Whitley as they went outside. A man suddenly tackled Pearce and started "pounding [Pearce's] head into the ground." Whitley saw a black man "lying face down in the parking lot with another man on top of him and two men standing over him hitting him in the head with shovels." The men hit McCarty in the head four or five times. Whitley thought it was appellant who was holding McCarty. Several of the customers managed to break up the fight. Whitley told the four men that the police had been called and that they should wait and talk to the police. Whitley then went to speak with McCarty. As she was speaking to McCarty, the men began to call Whitley "a nigger lover." The four men got in the car and drove away before the police arrived. Whitley identified appellant, John Nesbitt, Malcom Woody, and Don Woody as the four men in the parking lot assaulting McCarty. Whitley did not remember McCarty yelling for a gun. Nor did she remember appellant telling her McCarty had a knife and McCarty responding, "Yes, I've got a knife and I'll use it."

G.W. McCartney, a customer from the pool hall, testified that he heard a woman come into the pool hall and tell Whitley to call 911. McCartney went outside to the parking lot. He saw three people, two of them "whaling away with shovels on a man on the ground." The third man was kicking the man on the ground who McCartney identified as McCarty. According to McCartney, McCarty was "beat up, bloody, [and] trying to cover himself up." McCartney ran up to the men, took the shovels away, and hit one of the men in an attempt to stop the beating. McCartney then took the shovels inside the pool hall. McCartney came back outside to stay near Whitley because he was concerned for her safety.

John Guest, a customer from the pool hall, testified that he helped McCartney break up the fight in the parking lot. Guest saw the defendants beating on McCarty. Two men were swinging shovels and trying to kick McCarty. McCarty was lying on the ground. He did not have a shovel, a knife, or a gun. Guest was concerned for Whitley's safety because the four men were in "such an angry mood."

Appellant testified that he went to Speed's with Nesbitt, Malcolm Woody, and Don Woody to shoot pool. Appellant and Nesbitt left the pool hall, followed by Malcom. Don came out of the pool hall to get Malcom to pay the bill. Appellant was in the car waiting on Don and Malcom when he noticed a wheelbarrow in the parking lot. Appellant got out of the car and moved the wheelbarrow. Don and Malcom came out of the pool hall. The four men were in the car leaving the parking lot when McCarty confronted appellant with a shovel yelling at appellant to

2. Whitley testified Ron's last name was "Wood" or "Woods."

"get his ass out of the car." Appellant got out of the car to see what McCarty wanted. McCarty was "swinging a knife at [Don] and whaling a shovel in front of him." Appellant shouted, "He's got a knife." McCarty swung the shovel and hit Don in the chest. McCarty then turned and lunged at appellant with the knife. McCarty was shouting threats, swinging the shovel, and lunging with the knife all at the same time. Nesbitt jumped on McCarty. None of the other three men jumped on him. None of the men hit McCarty in the head with a shovel. When a man came out of the pool hall, appellant confronted a big man from the pool hall and told him to "stay out of it." Then the fight was over. Whitley came from the bar, and appellant asked her to ask McCarty if he had a knife. McCarty yelled he had a knife and was going to cut appellant with it. Then McCarty started "hollering for somebody to get a gun." Appellant told Whitley that he was leaving because McCarty had a gun. The four men left and went home.

Nesbitt testified that as the four men were pulling out of the parking lot, McCarty approached them cursing and yelling. McCarty told them to get out of the car. McCarty looked "crazed." McCarty lunged at the men with a shovel in his hand. McCarty hit Don in the chest with the shovel. McCarty lunged at appellant with a knife, appellant jumped back and McCarty cut Nesbitt on his leg. Appellant, Nesbitt, and Don then rushed McCarty and knocked him to the ground. Nesbitt held him down with his knee, and McCarty cut the back of his head on the asphalt while Nesbitt was searching for the knife to keep from getting cut again. Someone then choked Nesbitt from behind and pulled him to his feet.

Both Don and Malcom Woody testified to substantially the same story. They were leaving the parking lot when McCarty confronted them with the shovel. McCarty was "crazy," yelling, and cursing. McCarty pulled a knife on them and cut Nesbitt on the leg. None of the men said anything disparaging to McCarty. None of the men hit McCarty on the head with a shovel.

Although all four men were charged with aggravated assault, the jury found appellant, Nesbitt, Don Woody, and Malcom Woody guilty of the lesser included offense of assault. The trial judge then held a hearing to determine whether the offense was committed because of bias or prejudice. The trial judge found that appellant and Don Woody intentionally selected McCarty as a victim primarily because of the defendants' bias or prejudice against McCarty's race. The trial judge did not make a hate crime finding against defendants Nesbitt and Malcolm Woody. Appellant, Don Woody, and Malcolm Woody changed their punishment elections from the jury to the trial judge.[3] The trial judge discharged the jury and sentenced appellant to seven years' confinement. This appeal followed.

## SELF–DEFENSE

■ In point of error three, appellant contends the evidence is legally insufficient to support his conviction for assault because the State failed to disprove self-defense beyond a reasonable doubt. Thus, viewing all the evidence in the light most favorable to the prosecution, we must determine whether any rational trier of fact could have found all of the essential elements of assault and also could have found against appellant on the self-defense issue beyond a reasonable doubt. See Saxton v. State, 804 S.W.2d 910, 914 (Tex.Crim.App.1991).

■ Self-defense is an issue of fact to be determined by the jury. Saxton, 804 S.W.2d at 913. A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory. Saxton, 804 S.W.2d at 913. The jury is the sole judge of the credibility of the witnesses and the weight given their testimony. Bonham v. State, 680 S.W.2d 815, 819 (Tex.Crim.App.1984), cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). The trier of fact can accept or reject any or all of a witness's testimony. Hemphill v. State, 505 S.W.2d 560, 562 (Tex.Crim.App. 1974).

■ A person commits the offense of assault if he intentionally, knowingly, or

3. Nesbitt had previously elected for the trial court to assess punishment.

recklessly causes bodily injury to another. TEX.PENAL CODE ANN. § 22.01(a)(1) (Vernon 1994).[4] A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX.PENAL CODE ANN. § 9.31(a) (Vernon 1994).

Appellant contends that because the testimony is "uncontradicted that [McCarty] was first kicked after approaching the car while having his hand in his pocket from which he pulled his open knife," the evidence clearly establishes that a reasonable trier of fact could not have found against appellant on the self-defense issue. We disagree.

McCarty testified that appellant and his co-defendants blocked McCarty's car with their car. They then initiated a confrontation by calling McCarty "boy" and "nigger," and telling McCarty that "he was looking for trouble and he found it." As McCarty backed away from the group of men, appellant told McCarty he was "going to get an ass whipping." McCarty testified that he did not pull his pocketknife out of his pocket until after Don Woody kicked him in the stomach. Five witnesses testified that appellant and his codefendants held McCarty down, while kicking him and hitting him in the head with a shovel. Although appellant, Nesbitt, Don, and Malcolm testified that they were in their car leaving the parking lot when McCarty confronted them with the shovel looking "crazy," yelling, cursing, and pulling a knife on them, the jury was free to disbelieve their testimony. Further, even if the jury did believe appellant's and his co-defendants' testimony, a rational jury could have concluded that the four men could have simply driven away, and that a reasonable person would not have believed force was immediately necessary to protect themselves from McCarty.

Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational jury could have found that

appellant intentionally or knowingly caused bodily injury to McCarty. Further, we conclude a rational jury could have found against appellant on his claim of self-defense. We overrule point of error three.

## HATE CRIME FINDING

### 1. Sufficiency of the Evidence

■ In point of error one, appellant contends the evidence is legally insufficient to support the trial judge's finding that appellant intentionally selected McCarty as a victim primarily because of his bias or prejudice against McCarty's race. On original submission we declined to address this issue due to our disposition of point of error four. Appellant argues in his motion for rehearing that this Court must rule on his sufficiency challenge to avoid double jeopardy. After reviewing cases involving similar issues, we agree with appellant that we must address his sufficiency complaint. See, e.g., Ex parte Sewell, 742 S.W.2d 393, 396–97 (Tex.Crim. App.1987) (abandonment by the State of a conviction for enhancement purposes amounts to an acquittal, thus, double jeopardy bars use of the abandoned conviction for future enhancement purposes); Carter v. State, 676 S.W.2d 353, 354–55 (Tex.Crim.App. 1984) (double jeopardy principles bar the State from using a previous conviction to enhance punishment under the habitual offender statute where the prosecution has previously failed to prove the prior conviction under 12.42(d) in an earlier offense); Sanchez v. State, 906 S.W.2d 176, 180–81 (Tex. App.—Fort Worth 1995, pet. ref'd) (double jeopardy principles require consideration of sufficiency of the evidence to support a deadly weapon finding).

■ When reviewing a challenge to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict. We determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,

---

4. The offense occurred before September 1, 1994 and the enactment of the current version of the Penal Code. However, because subsequent amendments made no substantive changes to the provisions of the penal code relevant to this appeal, for convenience purposes, we will cite to the current version of the penal code.

319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988). This standard leaves to the factfinder the responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *See Dumas v. State,* 812 S.W.2d 611, 615 (Tex.App.—Dallas 1991, pet. ref'd). The factfinder is the sole judge of the credibility of the witnesses and the weight given their testimony. *Bonham,* 680 S.W.2d at 819. Thus, the factfinder is free to accept or reject any or all of a witness's testimony. *See Saxton,* 804 S.W.2d at 914. Our job is not to reweigh the evidence as "a super or thirteenth juror." *Hughes v. State,* 897 S.W.2d 285, 290 (Tex.Crim.App. 1994), *cert. denied,* 514 U.S. 1112, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995). Instead, we act as a final due-process safeguard to ensure the factfinder's rationality. *Moreno,* 755 S.W.2d at 867.

Article 42.014 of the Texas Code of Criminal Procedure provides as follows:

> In the punishment phase of the trial of an offense under the Penal Code, if the court determines that the defendant intentionally selected the victim primarily because of the defendant's bias or prejudice against a group, the court shall make an affirmative finding of that fact and enter the affirmative finding in the judgment of that case.

TEX.CODE CRIM.PROC.ANN. art. 42.014 (Vernon Supp.1997). If the court makes an affirmative finding under article 42.014, the punishment for the offense is increased to the punishment prescribed for the next highest category of offense. *See* TEX.PENAL CODE ANN. § 12.47 (Vernon 1994).

■ Appellant contends that "there is no evidence that [he] had a conscious objective or desire prior to the encounter, to primarily select [McCarty] to fight with and that if he did, [appellant] chose [McCarty] in preference to others or because of [appellant's] conscious desire to pick out [McCarty] chiefly because of his color." Thus, he argues, there is no evidence to support the hate crime finding. We disagree.

Both McCarty and his wife testified the encounter began when appellant said, "Hey, boy, I'm talking to you." McCarty testified

that when McCarty looked at him, appellant said "Yes, I'm talking to you. You're looking for trouble, aren't you? You're looking for trouble and you just found some." Appellant then told McCarty, "Boy, you're going to get an ass whipping." Appellant called McCarty a "nigger" once or twice. Appellant later said, "Nigger, we're going to kill you." Whitley testified that after the fight was over, she was speaking to McCarty and the men began to call her "a nigger lover."

Although there is no direct evidence that appellant selected McCarty as a victim because of McCarty's race, the record indicates that appellant (1) initiated the confrontation, (2) used racial slurs before, during, and after the assault, and (3) called people who came to McCarty's aid "nigger lovers." Viewing the evidence in the light most favorable to the finding, we conclude a rational factfinder could have found that appellant selected McCarty as a victim primarily because of his bias or prejudice against McCarty's race. We overrule point of error one.

### 2. Failure to Submit the Hate Crime Issue to the Jury

■ In point of error two, appellant contends the trial judge committed reversible error by failing to submit the hate crime issue to the jury. On original submission we declined to address this issue due to our disposition of point of error four. Appellant argues in his motion for rehearing that if we determine there is sufficient evidence of a hate crime, this Court should address whether the trial judge or the jury should make the hate crime finding to give guidance to the trial judge when the issue is relitigated at the new punishment hearing. We agree.

As we have previously stated, article 42.014 of the Texas Code of Criminal Procedure provides as follows:

> In the punishment phase of the trial of an offense under the Penal Code, if *the court determines* that the defendant intentionally selected the victim primarily because of the defendant's bias or prejudice against a group, the court shall make an affirmative finding of that fact and enter the affirmative finding in the judgment of that case.

TEX.CODE CRIM.PROC.ANN. art. 42.014 (Vernon Supp.1997) (emphasis added). Appellant contends that, irrespective of the express language of the statute, we should analogize the statute to section 12.42 of the Texas Penal Code and article 42.12, section 3g(a)(2) of the Texas Code of Criminal Procedure and determine that "court" is intended to denote the factfinder. We disagree.

Section 12.42 of the Texas Penal Code provides for increased punishment "if it is shown" that a defendant has prior felony convictions. *See* TEX.PENAL CODE ANN. § 12.42 (Vernon 1994 & Supp.1997). Article 42.12 of the Texas Code of Criminal Procedure specifies the period of time an offender must serve on his sentence before parole eligibility if "it is shown" that a defendant used or exhibited a deadly weapon. *See* TEX.CODE CRIM.PROC.ANN. art. 42.12, § 3g(a)(2) (Vernon Supp.1997). Unlike article 42.014, neither statute specifically provides for "the court" to make the required finding. Because the plain language of the statute indicates the legislature intended the "court," and not the "factfinder," to make the hate crime finding, we conclude the trial judge did not err by refusing to submit the issue to the jury. We overrule point of error two.

## DUE PROCESS OF LAW

In point of error four, appellant contends he was denied due process of law by the trial judge's misleading statement about his interpretation of the law and the course of action the trial judge intended to make regarding punishment. We agree.

Prior to trial, appellant elected that in the event he was found guilty, the jury would determine his punishment. The jury found appellant guilty of the lesser included offense of misdemeanor assault. Prior to the punishment hearing, the following discussion was held outside the presence of the jury:

> The Court: Well, I need to make a few points about the application, procedural application, anyway, of section 12.47.

> * * *

> [U]nder section 12.47 when we increase the punishment proscribed for the next

highest category of offense, at the time this offense was committed that was a third-degree felony, the misdemeanor offense of assault being then and now a Class A misdemeanor.

Since that time, September 1, 1994, the state jail felony penalty range has come into effect and under the common-law doctrine of amelioration, there being nothing that I have had pointed out to me to determine—to disapply (sic) the doctrine of amelioration, it would seem that the defendant would have the option to elect to have that lower punishment range applied in this case if the defendant so chose in any of the four cases, and I realize the State objects to this particular procedure.

There are, I might point out to the State, if any of these convictions are appealed, you, of course, can carry up a question of law, and I will invite you to do so on any part you disagree with and any part you agree with, for that matter.

Those are the Court's rulings. Any objection to the Court's rulings?

The trial judge then held a hearing to determine whether the offense was committed because of bias or prejudice. The trial judge found that appellant and Don Woody intentionally selected McCarty as a victim primarily because of their bias or prejudice against McCarty's race. Accordingly, the punishment range for appellant's and Don Woody's misdemeanor assault convictions was increased to the next highest category of offense. *See* TEX.PENAL CODE ANN. § 12.47 (Vernon 1994). As a result of the trial judge's previous holdings, the following discussion occurred:

> [Counsel for appellant]: Your honor, for clarification, are we now looking at mandatory probation because it is a state jail felony? I'm thinking of why go to the jury if that's where we are. I mean, I would withdraw my election if I think that's where we are.

> The Court: I understand. I'll hear from the State. I mean, we're in state jail felony. The question is whether section 15 applies or not.

* * *

[N]otwithstanding the clear wording of section 15, which calls for mandatory suspension of sentence upon conviction of a state jail felony, I ... think it would be an absurd result to interpret section 15 only to apply to a conviction for a state jail felony. So under 12.47, I believe we are not only in the state jail felony penalty range for Defendant[s] Sterry and Woody, but that section 15 should apply.

[Counsel for appellant]: Your honor, in light of the finding, I would withdraw my election for the jury to determine punishment on Gilbert Sterry.

* * *

[Counsel for Don Woody]: Your honor, in light of the finding, may I have a moment to speak to my client as to whether he wishes to try to modify his election or continue as is?

* * *

[Counsel for Don Woody]: As to Defendant Don Woody, we would also elect the Court to assess punishment.

* * *

The Court: All right. We're going to bring the jury in and discharge them, then?

The trial judge then told the jury, "We had a hearing this morning to determine the range of punishment and based on that hearing, the election was changed." The trial judge explained to the jurors he would continue the case to give the probation department time to do its work and then would "assess a punishment somewhere within the penalty range which tops out for two of the defendants at—the most is two years in jail probated for five years." The trial judge then discharged the jury. The punishment hearing was reset. One week before the punishment hearing, the trial judge notified appellant that he had done further research and determined that the applicable range of punishment was not a state jail felony with mandatory probation as he had previously

stated, but rather the applicable range of punishment was that of a third-degree felony. Prior to the punishment hearing, appellant objected to the trial judge assessing punishment, arguing that his decision to change his election from the jury assessing punishment to the court assessing punishment was based upon the trial judge's ruling that the applicable punishment range was that of a state jail felony with mandatory probation.

■ A defendant in a criminal case has no constitutional right to have a jury assess punishment. *Allen v. State*, 552 S.W.2d 843, 847 (Tex.Crim.App.1977). He does, however, have a statutory right to have the jury assess punishment. *See* TEX.CODE CRIM.PROC.ANN. art. 37.07, § 2(b) (Vernon Supp.1997); *Washington v. State*, 677 S.W.2d 524, 527 (Tex. Crim.App.1984). This valuable statutory right may not be taken away without due process of law. *See Ex parte Moser*, 602 S.W.2d 530, 533 (Tex.Crim.App.1980) (legislature having statutorily created assessment of punishment by the jury may alter or abolish the procedure within the bounds of due process and other constitutional procedures), *overruled on other grounds by Polk v. State*, 693 S.W.2d 391 (Tex.Crim.App.1985). Due process involves fundamental notions of fair play and justice. *See Armstrong v. State*, 897 S.W.2d 361, 368 (Tex.Crim.App.1995). A basic requirement of due process is a fair trial. *Armstrong*, 897 S.W.2d at 368.

■ Appellant waived his valuable statutory right to have the jury assess punishment based on the trial judge's misstatement that the applicable sentencing range for his offense was that of a state jail felony with mandatory probation. When the trial judge later stated that the applicable sentencing range was not a state jail felony but rather a third-degree felony, the jury had been discharged. The trial judge could not order a new jury to assess punishment. *See* TEX. CODE CRIM.PROC.ANN. art. 37.07, § 2(b) (Vernon Supp.1997); *State v. Bates*, 889 S.W.2d 306, 310–11 (Tex.Crim.App.1994) (trial court may not order a new trial on the issue of punishment only). Fundamental fairness does not allow a judge's misstatements of the law to mislead a defendant into waiving his

valuable right to a jury. We conclude appellant was denied a fair trial in the punishment phase of the trial because of the particular circumstances under which he waived his right to a jury for assessment of punishment. We sustain point of error four.

■ In his remaining points of error, appellant brings additional challenges to the punishment phase of his trial. Specifically, appellant contends that (1) he should have been punished for a state jail felony; (2) the State failed to give notice of its punishment evidence; (3) the trial judge erred by denying him access to the victim impact statement prior to sentencing; and (4) the Texas Hate Crime Statute is void for vagueness under both the state and federal constitutions. We do not determine the constitutionality of a statute unless it is absolutely necessary to decide the case in which the issue is raised. *See Smith v. State,* 658 S.W.2d 172, 174 (Tex.Crim.App.1983). Because we agree with appellant that he was deprived of his right to have a jury assess punishment, we reverse the trial court's judgment and remand for a new punishment hearing. *See* TEX.CODE CRIM.PROC.ANN. art. 44.29(b) (Vernon Supp.1997). Because appellant will receive a new punishment hearing, we need not address appellant's remaining complaints about the punishment phase of his trial. *See* TEX.R.APP.P. 90(a).