

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00356-CR

CESAR ALEJANDRO GAMINO                                APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY
TRIAL COURT NO. 1337520D

----------

## OPINION

----------

A jury found Appellant Cesar Alejandro Gamino guilty of aggravated assault with a deadly weapon and assessed his punishment at four years' confinement in the penitentiary and a $2,000 fine. The jury further recommended that Appellant's sentence be suspended and that he be placed on community supervision. The trial court entered judgment accordingly and placed Appellant on community supervision for a period of ten years. In two issues, Appellant

asserts the trial court erred by refusing to give a jury instruction on self-defense and erred in refusing to allow him to cross-examine the complainant and a police officer regarding the disposition of the public intoxication charges against the complainant. We sustain Appellant's first issue, reverse the trial court's judgment, and remand the cause to the trial court for a new trial. Because Appellant's first issue disposes of his appeal, we need not address his second issue.

## Evidence

Oscar Flores, a Fort Worth Police officer, testified he was working off-duty for City Center Security in Sundance Plaza on August 11, 2013, and was in a downtown Sundance Square parking lot on a bicycle with another off-duty officer and two City Center security officers around 1:30 a.m. The bars were closing, and the area was crowded as people were walking to their cars. The area was noisy with people talking and laughing, but he heard arguing and yelling, and someone said, "Yeah, well, I got something for you." Officer Flores said he turned around and saw Appellant walk over to the driver's side of a pickup truck and take something out. He said the officers all assumed that Appellant was going after a weapon. Officer Flores saw Appellant come out with a pistol in his hand. Officer Flores said he thought Appellant was going to shoot some people standing on the sidewalk, so Officer Flores drew his gun as he saw Appellant's gun coming up. He looked over at the sidewalk and saw several people backing up, "like, whoa," and saw that the complainant and his friends were putting their

2

hands in the air. Officer Flores testified he was close to shooting Appellant and was actually pulling back on the trigger of his own gun when he saw a woman get out of the passenger door and walk toward the rear of the pickup along with Appellant, so he decided not to shoot for fear of accidentally striking someone else. Officer Flores ordered Appellant to drop the gun and testified that Appellant immediately lowered the weapon and did not present any kind of aggressive stance. Officer Flores said he knew at that point that Appellant was going to comply with his orders. After Appellant turned around and put the pistol on the driver's seat of the pickup, Officer Flores ordered him to put his hands up, and Appellant put his hands up as ordered. Officer Flores said he had to tell Appellant a few times to get on the ground, but Appellant complied, and the police placed Appellant in handcuffs.

Officer Flores recalled that when detained, Appellant said, "Well, he was talking shit." Officer Flores said "talking shit" to someone did not give that person the right to pull a gun. He confirmed that a person, including a police officer, is only allowed to use deadly force against another when the other person presents a threat of deadly force or a risk of serious bodily injury. On cross-examination, Officer Flores said whether a person had the right to protect himself depended on the situation.

Officer Flores described the persons on the sidewalk as scared and said that one person, identified as the complainant, told him that he was in fear for his life and thought he was going to be killed. But the police also had problems with

3

the alleged complainant, Mohamad Khan. Officer Flores acknowledged that Khan kept interfering with the armed police officers and with the security officers, who were armed with tasers and pepper spray. The police report described Khan as a danger to both himself and to others. While Officer Flores and two other officers were taking Appellant into custody, Khan caused a disturbance. Khan was arrested at the scene for public intoxication.

Officer Flores determined that the gun was a Glock subcompact, loaded with a round in the chamber, the same type of gun used by police, and confirmed that Appellant possessed a concealed handgun license. He noticed Appellant also had signs of intoxication, including heavy, bloodshot, and watery eyes, slurred speech, and a strong odor of an alcoholic beverage on his breath and person. Officer Flores performed an HGN test on Appellant and noted six clues, three for each eye, which was the maximum number. Appellant was parked in a handicapped parking area, and Officer Flores recalled that Appellant mentioned that he had problems with his back and may have been taking medications for that problem, but he could not recall specific medications that Appellant told him he was taking. Officer Flores acknowledged it was possible that both medical conditions and medications could cause the HGN results.

Detective Kynrick Koralewski, also with the Fort Worth Police Department, was also working bike patrol that night in an off-duty capacity for Bass security at Sundance Square. Detective Koralewski testified that he, Officer Flores, and the two other security employees in the parking lot in the Sundance Square area that

4

evening heard someone say in a fairly loud, aggravated voice, "I got something for you." Detective Koralewski saw Appellant, who had a girlfriend with him. When Officer Flores said, "He's got a gun," Detective Koralewski dismounted from his bike, turned around, also saw Appellant with the gun, and drew his service revolver. Detective Koralewski testified that he saw Appellant pointing the gun at another male. Detective Koralewski thought he was going to have to shoot someone, but Appellant went back to his pickup, placed the gun in the truck, and went to the ground, where police handcuffed him.

Detective Koralewski said alcohol affects a person's judgment, and putting a gun in the hands of someone who has had alcohol was a very volatile situation. Detective Koralewski said that, as an officer, he was allowed to draw his gun only when there was a threat of imminent force in a life or death situation. He was not allowed to pull his gun when someone merely smarted off to him or verbally provoked him. By "imminent," he meant something that was about to happen and not something off in the future.

Khan, the complainant, testified that on the night in question, he was celebrating a friend's birthday along with a third person he had met that night. They went to a couple of bars and then, around 1:30 a.m., they sat down by the street on a concrete planter under a tree. Khan explained he was quoting some lines from the movie, "Boondock Saints," that involved lewd conduct with a woman. He said it was meant just for his friends' ears and was embarrassed that other people might have overheard him. Appellant, who was walking by with a

5

female, started yelling at him and asked him what he had said. Khan testified that he was confused at first and told Appellant that he was not talking to him and to just keep walking. He said Appellant responded, "Oh, I got something for you, I got something for you." Khan denied attempting to assault Appellant or the person Appellant was with. Khan said Appellant walked to a parked car, opened the door, shuffled around inside, pulled out a gun, and started yelling, "Say something else, say something else." Khan threw his hands up. He thought Appellant was going to shoot him, and he was in fear for his life. He believed Appellant's demeanor showed that he was capable of pulling the trigger. Khan said he told Appellant that he needed to chill out, and moments later a number of police officers ran up, told Appellant to get down on the ground, and ordered Appellant to drop his weapon. Khan said he was happy—"ecstatic"—that the police were there, but the police later arrested him as well; Khan testified that the charge against him was later dismissed.

Z.W. testified that he, Khan, and a third friend had been "just hanging out and going to bars" on the night of the incident, celebrating Z.W.'s birthday. Around 1:30 a.m. on August 11, 2013, they left a bar, headed toward their car, and sat down on the concrete seat of a planter under a tree near a parking lot. The three of them were quoting lines from the movie, "Boondock Saints." After Khan had said one of the lines, Appellant, who was walking by with a woman, turned around and asked, "What the hell did you say?" They told Appellant that they were not talking to him. Z.W. said Appellant responded with profanity and

6

then went to his car and pulled out a gun on them. The police responded immediately and told him to drop the gun. Z.W. estimated that Appellant was only ten to fifteen feet away from them when he pulled out the gun. Z.W. was afraid Appellant was going to use the gun to cause imminent bodily injury at the very least. Z.W. said he was still sitting down. Z.W. said that none of them were armed and that no one tried to touch Appellant or his girlfriend. Z.W. denied that Khan threatened Appellant in any way. After the incident, Z.W. said Khan got up and was angry, and although both the police and Z.W. told Khan to sit down and be quiet, Khan would not follow anyone's instructions.

Josh Burris worked as a security officer in the Sundance Square area of downtown Fort Worth. He was working the early morning of August 11, 2013, and testified that between 1:30 and 1:40 a.m., while on duty in the parking lot where he was patrolling along with Officers Lopez, Koralewski, and Flores, he heard someone yell, "I've got something for you." Officer Burris said the person sounded angry, and he added, "It usually is something you don't hear unless there's an altercation coming up." He saw Appellant walk towards his vehicle three or four steps, open the driver's door, lean in, and reach underneath the driver's seat. Appellant came out of the car with a handgun in his hand, turned, and started walking toward the sidewalk with the gun up in the air pointing straight ahead of him at some individuals. One of the individuals raised his hands like he was surrendering. Officer Flores and Detective Koralewski pulled their weapons, moved toward the group, and pointed their guns at Appellant.

7

They ordered Appellant to drop the gun and get on the ground, and they got the situation under control. Officer Burris said Appellant, when pointing the gun and advancing on Khan, held it in an aggressive stance and described it as a trained position. Officer Burris said that when the other officers told Appellant to drop the weapon, Appellant did not comply immediately but turned and went about six feet back to his car to place the gun there.

V.R. testified that she was with Appellant on the night of August 10 and 11, 2013, in downtown Fort Worth. V.R. had known Appellant for eight years. She testified that after coming back from overseas, Appellant had two back surgeries. Appellant also had failed knees and shoulders. She explained that Appellant was "disabled." On that particular night, they went out to have dinner downtown with a friend Appellant had been stationed with and his girlfriend and then headed to a dance club. When Appellant and V.R. left there, she said they headed for the car and came across three men. One of them stood up, moved towards her, and threatened to assault her. She testified that the man said he would sodomize her. She retreated from the man and tried to walk around to the other side while Appellant went to the pickup. V.R. said she did not know what happened next; she just heard the police telling her to get down. V.R. said that after two major back surgeries, Appellant was not able to fight, so he carried a gun. She said Appellant had a license to carry a gun. V.R. said there were three men, but only one threatened her, and she testified that she feared for her life. However, she denied that the man threatened to beat or harm her.

8

Appellant testified that on the evening of August 10, 2013, he took his friend and his friend's girlfriend out to see the town. They drove around first and then decided to have a bite to eat at Ojos Locos, a downtown restaurant. After they ate, he said they went to a dance club behind the restaurant, where he had one drink. Appellant acknowledged taking his back-pain medication much earlier that day and agreed that mixing his medications and alcohol was not a good idea "if you're chasing one with the other." Appellant denied being intoxicated.

While returning to his vehicle, he encountered three men. Appellant testified that the men threatened both him and his girlfriend. Asked to describe the threats, he said, "Well, they threatened that they would grab her ass and they would F her if they wanted to and that they would kick my ass and I wasn't going to do anything about it."

Appellant testified that he retreated but made sure his girlfriend was safe, and then he approached his vehicle. Appellant said one of the individuals stood up and came at him, and that was when he reached into his vehicle, grabbed his gun, and said, "Stop, leave us alone, get away from us." Appellant testified that when the man saw the gun, he did something with his hands, sat down, and did not say anything. Appellant said he told the man to have a good night, turned around, and placed his weapon back in his vehicle. Appellant testified that it was at this point that the police approached him and told him to get on the ground. When asked if he had the time to shoot the individual who came at him, Appellant answered, "If it was up and pointed, yes. But it—as soon as he

9

retreated, no. I mean, I just wanted to eliminate the threat at that moment." Appellant testified that after the threat was over, he just wanted to go home. Appellant said the police showed up at this point, put him on the ground, and put him in handcuffs. Appellant denied resisting the police and said, "I didn't think I did anything wrong."

Appellant testified that after the individual made the threats, Appellant and his girlfriend were scared. Appellant acknowledged that the man did not threaten to beat him right away, did not threaten him with deadly force, did not threaten to beat up his girlfriend, and did not threaten to use deadly force on her. Appellant admitted not seeing a gun or a knife. Appellant admitted Khan never touched him or his girlfriend. Appellant said it was fair to say Khan said something he did not like. Appellant denied ever saying, "I've got something for you." Appellant acknowledged he retrieved his gun from underneath the seat and pulled it out, but he denied pointing it.

Appellant testified that he was taught not to use a gun when intoxicated and taught to exhibit a gun only when met with deadly force or in fear of imminent bodily injury or serious bodily injury. Appellant agreed that it was not okay to pull a gun on someone just because the other person said something he did not like, but he added that it changed when someone threatened to physically assault or hurt another person. Appellant testified that the men threatened to use deadly force on him. He explained, "They said they were going to kick my ass." When asked if that was deadly force, Appellant answered, "And it's three of them and

I'm one person that's disabled." Appellant agreed that deadly force meant pulling a gun. Appellant acknowledged the men had no weapons that he knew of. When asked if he was the only one who pulled a gun that night, he answered, "Yes, because I felt like my life was in danger. I felt like the safety of my fiancée was in danger."

Appellant denied that he felt that way because of what they said; he testified that it was because of their actions. "When he stood up and approached me in an aggressive manner, that was when I drew my weapon. That's when I held it up to my side and I held my hand up and said, [']Get back, leave us alone,['] and that was when he retreated."

Appellant admitted he told the officer he pulled his gun because Khan was "talking shit," but Appellant denied that was all that he told the officer. Appellant testified that he told the officer that Khan also said he was going to assault him.

Appellant testified that while he was on the ground, Khan kept taunting him and kept jumping towards him. Appellant said he repeatedly told the officer that Khan was the guy who was threatening him and his girlfriend. Appellant was able to tell another officer what happened, and that officer informed him that they were arresting Khan as well. Appellant testified he pulled his weapon in self-defense.

11

**First Point:  Trial Court's Failure to Submit Self-Defense in Jury Charge**

In Appellant's first point, he contends the trial court erred by overruling his request that self-defense be included in the jury charge.  The State does not dispute that Appellant preserved the error.

*Whether there was error.*

A defendant is entitled to an instruction on any defense supported by the evidence, even if the evidence is weak, contradicted, or lacks credibility.  *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1059 (2008).  Under the confession-and-avoidance doctrine, however, a defensive instruction is appropriate only when the defendant admits to every element of the offense and interposes the justification to excuse the otherwise criminal conduct. *Id.* at 659; *Ex parte Nailor*, 149 S.W.3d 125, 132–33 (Tex. Crim. App. 2004).  To raise the issue of self-defense, the accused must admit the conduct charged in the indictment and then offer self-defense as a justification for the action.  *Hill v. State*, 99 S.W.3d 248, 250–51 (Tex. App.—Fort Worth 2003, pet. ref'd) (stating self-defense instruction required defendant admit charged conduct); *Anderson v. State*, 11 S.W.3d 369, 372 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating that to raise issue of self-defense, defendant must admit he committed offense).  As a justification for actions taken, self-defense is inconsistent with a denial of the conduct.  *East v. State*, 76 S.W.3d 736, 738 (Tex. App.—Waco 2002, no pet.).

Both sections 9.31 and 9.32 of the penal code are self-defense statutes with the difference being that section 9.31 addresses the use of force in self-defense and section 9.32 addresses the use of deadly force in self-defense. Section 9.31 is specifically entitled, "Self-defense." Tex. Penal Code Ann. § 9.31 (West 2011). Section 9.32 is entitled, "Deadly Force in Defense of Person." Tex. Penal Code Ann. § 9.32 (West 2011). When referring to "self-defense," we are referring to section 9.31. When referring to the "deadly-force-in-defense-of-person defense" or to "self-defense with deadly force," we are referring to section 9.32.

The State's position is that because Appellant used a deadly weapon, it necessarily follows Appellant used deadly force, which necessarily placed Appellant under section 9.32 rather than section 9.31. Tex. Penal Code. Ann. §§ 9.31, 9.32. The State contends that because Appellant was restricted to the deadly-force-in-defense-of-person defense under section 9.32, Appellant had to show that he reasonably believed Khan was either using or attempting to use deadly force. Tex. Penal Code Ann. § 9.32(a)(2)(A). The State then argues that Appellant could never show that Khan used or attempted to use deadly force.[1]

---

[1]The State's reliance on *Bedolla v. State*, 442 S.W.3d 313 (Tex. Crim. App. 2014), and *Jackson v. State*, 288 S.W.3d 60 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd), is not persuasive. In both cases, there was no discussion regarding whether the defendant's use of deadly force otherwise disqualified him from receiving the section 9.32 instruction because the complainant had not used or attempted to use deadly force.

The State's position ignores section 9.04 of the penal code, which provides:

> The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

Tex. Penal Code Ann. § 9.04 (West 2011).[2] If section 9.04 applies, then the use of a gun does not constitute "deadly force," and, therefore, section 9.32 would become inapplicable. Tex. Penal Code Ann. § 9.32 ("Deadly Force in Defense of Person"). If section 9.04 applies, then the use of the gun would, by default, be the use of "force" in self-defense, and section 9.31 would be the applicable provision. Tex. Penal Code Ann. § 9.31 (defining when the use of force is justified in self-defense). In a footnote and in his reply brief, Appellant directs us to *Reynolds v. State*, 371 S.W.3d 511, 514, 522 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd), as an example of the use of section 9.04 in this manner.[3] For our purposes, Appellant is correct that the defendant in *Reynolds*, who was under the mistaken impression that his friend was about to be attacked by a group of people, used a gun in an attempt to frighten the group into leaving; he

---

[2]Although Appellant cites section 9.04 in his brief, the State never addresses it in its brief.

[3]The State does not address *Reynolds.*

14

nevertheless got a self-defense instruction under section 9.31 apparently by virtue of section 9.04.[4] *Id.*

The State also argues that Appellant was not entitled to an instruction on self-defense because Appellant denied committing aggravated assault as charged in the indictment. Specifically, the State contends that although Appellant admitted using the gun, he otherwise denied making any threats. For example, Appellant denied saying, "I've got something for you," but claimed he said instead, "Leave us alone." The State also argues that by denying he pointed the gun at anyone, Appellant was denying he threatened anyone. We disagree. The State alleged in the indictment that Appellant used or exhibited a gun to threaten Khan with imminent bodily injury.[5] Appellant admitted pulling out and exhibiting the gun for the purpose of discouraging Khan from attacking him and his girlfriend. The display of a deadly weapon constitutes a threat. *Sosa v.*

---

[4]The jury instructions encompassed self-defense under section 9.31 and defense of third person under section 9.33 of the penal code; the defense of third person instructions, for their part, used elements of section 9.31 (self-defense) and of section 9.32 (deadly force in defense of person). *Id* at 523; *see* Tex. Penal Code Ann. §§ 9.31–.33 (West 2011). The actual issue in *Reynolds* was whether the trial court erred by not submitting a section 9.04 instruction; the court held the trial court erred but the error was harmless. *Reynolds*, 371 S.W.3d at 521–25.

[5]In its indictment, the State alleged that Appellant intentionally or knowingly threatened imminent bodily injury to Khan and, further, that Appellant used or exhibited a deadly weapon during the commission of the assault, to-wit: a firearm. Tex. Penal Code Ann. §§ 22.01(a)(2) (West Supp. 2014), 22.02(a)(2) (West 2011).

*State*, 177 S.W.3d 227, 231 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Nothing in the indictment required Appellant to point the gun at Khan. Nothing in the indictment required the threat to be communicated verbally or by a particular use of the gun. Appellant was not required to concede the State's version of the events. "[T]he defendant has the right to controvert the facts upon which the prosecution intends to rely, and that right includes claiming that events unfolded in a way different than the State has alleged." *Bufkin v. State*, 207 S.W.3d 779, 781–82 (Tex. Crim. App. 2006).

The State also relies on *Isaacson v. State*, No. 03-10-00866-CR, 2013 WL 1955799 (Tex. App.—Austin May 10, 2013, pet. ref'd) (mem. op., not designated for publication), but its reliance on it is misplaced. In that case, the application paragraph required the jury to find that the defendant pointed the gun at the officers, but the defendant specifically denied pointing the gun at them. *Id.* at *3. Additionally, the defendant was required to know that he was committing an aggravated assault on a public servant, but the defendant specifically denied knowing the complainants were peace officers. *Id.* Finally, the defendant admitted exhibiting a gun but denied threatening anyone in any manner. *Id.* It was in that context that the court wrote:

> The only aspect of the charged offense he admitted was exhibiting a handgun in the presence of others, which is not necessarily an offense—much less an assaultive one. His admission that he exhibited a weapon did not pass the threshold of admission that requires a court to provide a self-defense instruction to the offense of aggravated assault of a public servant.

16

*Id.* In contrast, Appellant's version of the events shows that he got and displayed the gun for the express purpose of discouraging Khan's attack, that is, he admitted the conduct alleged in the indictment.

Both Appellant and his girlfriend said Khan threatened to sexually assault her. Appellant said the men also threatened to "kick his ass." Both Appellant and his girlfriend said one of the men got up and moved towards them, and both Appellant and his girlfriend said they were afraid for their lives. Both Appellant and his girlfriend were aware that Appellant, because of his surgeries, could no longer fight. Both were aware they were dealing with a group of three men. Appellant admitted grabbing his gun. Appellant said he just wanted to eliminate the threat and go home. Appellant said he pulled his gun based upon Khan's actions: "When he stood up and approached me in an aggressive manner, that was when I drew my weapon." A person commits an assault if the person intentionally or knowingly threatens another person with imminent bodily injury. *See* Tex. Penal Code Ann. § 22.01(a)(2). A person is entitled to act in self-defense to an assault. *See* Tex. Pen. Code Ann. § 9.31(a) ("[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.");[6] *Bufkin v. State*, 179

---

[6]Under specified circumstances the actor's belief that force was immediately necessary is presumptively reasonable. Tex. Penal Code Ann. § 9.31(a)(1)–(3). We do not have to decide if Appellant's belief was entitled to this presumption.

S.W.3d 166, 169–70 (Tex. App.—Houston [14th Dist.] 2005), *aff'd*, 207 S.W.3d 779 (Tex. Crim. App. 2006); *Sterry v. State*, 959 S.W.2d 249, 253–54 (Tex. App.—Dallas 1997, no pet.); *see also Cedillo v. State*, No. 02-09-00388-CR, 2011 WL 476859, at *2–4 (Tex. App.—Fort Worth Feb. 10, 2011, no pet.) (mem. op., not designated for publication). Appellant effectively described an assault committed by Khan against him. Appellant described drawing his gun to defend himself and his girlfriend, and, as explained earlier, simply drawing a gun can constitute "force" and not "deadly force." *See* Tex. Penal Code Ann. § 9.04.

Appellant gave contradictory answers regarding whether the threat to him was imminent. He said Khan did not threaten to beat him right away. Regarding any verbal threats, that was true. On the other hand, he described Khan approaching him in an aggressive manner after Khan had made the verbal threats, and Appellant described himself as fearing for his life. A jury could have reasonably inferred from his testimony that when Khan got up and started to approach him, he believed he was in imminent danger and feared for his life. Appellant was entitled to the instruction regardless of whether the evidence was weak or contradictory. *See Shaw*, 243 S.W.3d at 658.

The police arrested Khan for public intoxication, and the police report described Khan as a danger to both himself and others. If Khan was so intoxicated and if Khan's behavior *after* the police were on the scene was sufficiently dangerous to himself and others to be noted in the police report, it would not be irrational to question whether Khan was intoxicated and exhibiting

18

dangerous behavior only moments before the police arrived at the scene. Put another way, if Khan was sufficiently intoxicated and dangerous in the presence of the police to get arrested, what was his behavior like before the police were on the scene? The presence of police normally acts as an inhibiting factor. In Khan's case, it did not. There was some testimony suggesting Khan's behavior may have been limited to after the police arrived and was due to his having just been threatened by a gun. That might well be true, but it was the jury's decision whether to believe it.

Appellant was entitled to the instruction regardless of whether the evidence was feeble, contradicted, or not credible. *See Reynolds*, 371 S.W.3d at 521–22. We are required to view the evidence in the light most favorable to the defendant's requested submission. *See id.* at 522. Whether a defendant's beliefs were reasonable under the circumstances is a fact question for the jury to decide and not a preliminary question for the trial court to resolve when determining whether the defense was raised. *See VanBrackle v. State*, 179 S.W.3d 708, 713 (Tex. App.—Austin 2005, no pet.); *see also Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996) ("A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real."). When it comes to whether defensive theories are raised, the usual deference to the trial court's rulings does not apply; just the reverse, appellate courts view the evidence in the light most favorable to the defendant's requested submission. *See Bufkin*, 207 S.W.3d at 782. Viewing the evidence in the light

most favorable to Appellant, Appellant reasonably believed his use of force was immediately necessary to protect himself against Khan's use or attempted use of unlawful force, and Appellant produced his gun for the limited purpose of creating an apprehension that he would use deadly force if necessary. We hold that under Appellant's version, his use of a deadly weapon did not constitute the use of deadly force and that Appellant was not disqualified from receiving a self-defense instruction notwithstanding the fact he was charged with aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 9.04; *Reynolds*, 371 S.W.3d at 521–25. Accordingly, the trial court erred by not submitting an instruction on self-defense.

*Whether there was harm.*

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006); *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a properly preserved error will require reversal as long as the error is not harmless. *Almanza*, 686 S.W.2d at 171. This analysis requires a reviewing court to consider (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see also Almanza*,

686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."). The presence of "*any* harm, regardless of degree," is sufficient to require reversal. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986).

Before trial, the trial court sustained the State's motion in limine as to any mention of Khan's alcohol or drug use, any mention of Khan's arrest for public intoxication, and any mention regarding why the charge of public intoxication against Khan was dismissed. Appellant argued that Khan's intoxication was "the whole ballpark" and that without the testimony showing Khan's intoxication, he would not be able to explain his reactions to the danger Khan presented. Appellant concluded, "Ours is a self[-]defense issue." During opening arguments, the State expressly told the jury that self-defense was not present in this case. The jury charge contained no self-defense instructions. During closing arguments, the State emphasized what was and what was not in the charge:

> The Judge just read you the charge, the law that controls the case. The point I want to make to you is, is that for your consideration is whether or not the Defendant is guilty of pointing a firearm. And you know he is.
>
> What's not before your consideration and what I will shut down quickly is if anybody gets up and starts trying to claim self[-]defense. Self[-]defense is not part of this case.
>
> The law is contained in this charge and that's the law that governs.

For his part, Appellant argued, "We're asking that, after reviewing the facts, to find that [Appellant] was not the aggressor but reacting to [Khan] and find [Appellant] not guilty beyond a reasonable doubt. Remember we said if you have one doubt based on reason, that is a reasonable doubt." Appellant was attempting to re-insert self-defense into the analysis. However, without a self-defense instruction in the charge, even if the jury agreed with Appellant's version of the facts, it was still required to find him guilty.

The State also argued in its final arguments: "So we ask you to return a verdict of guilty. It's clear. There's nothing to this case as far as a question about whether he's guilty. It's as easy as it gets." We agree. Without any self-defense instructions, it was as easy as it gets. Appellant admitted committing the aggravated assault with a deadly weapon to the jury. There was nothing for the jury to decide. The jury never got to decide the one defense Appellant had to offer.

Khan and Appellant agreed that Appellant pulled a gun on him. With the self-defense instruction, the case turned on whether the jury believed Khan's version or Appellant's version of the events. In Khan's version, he was exchanging crude jokes with his friends that Appellant overheard and overreacted to by pulling a gun on them. In Appellant's version, Khan, while with two other men and while sufficiently intoxicated to later be arrested for public intoxication, verbally threatened to sexually assault Appellant's girlfriend and to physically assault him and, moments later, Khan stood up and approached

Appellant in an aggressive manner that made both Appellant and his girlfriend fear for their lives; in response, Appellant pulled his gun to discourage any further aggression from Khan and his friends. Under the charge given to the jury, Appellant lost under both versions because Appellant's use of a gun constituted the unwarranted use of deadly force. Nothing in the charge provided that Appellant's conduct might have been justified or excused for any reason. *See Chase v. State*, 418 S.W.3d 296, 301–02 (Tex. App.—Austin 2013), *aff'd*, 448 S.W.3d 6 (Tex. Crim. App. 2014).

Regarding the testimony of the police officers, none of them saw what preceded Appellant's pulling his gun. Under the police officers' testimony, Appellant threatened Khan with a gun in a more violent manner than under Appellant's version. Appellant's version was perhaps more consistent with the application of section 9.04 of the penal code. Regardless, it was the jury's call whom to believe and what to believe. It was not the trial court's prerogative to preempt the issue because it thought Appellant's version was weak, contradicted, or not credible. *See Shaw*, 243 S.W.3d at 658; *see also Bufkin*, 179 S.W.3d. at 169 ("As the trier-of-fact, the jury is the sole judge of the credibility of the witnesses and is free to believe or disbelieve all, part, or none of any witness'[s] testimony."); *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) ("This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence."); *Sterry*, 959 S.W.2d at 253 ("The jury is the sole judge of the credibility of the witnesses and the weight given their

testimony."). We hold Appellant suffered harm. We sustain Appellant's first point.

### Conclusion

Because we sustained Appellant's first point regarding a self-defense instruction under section 9.31, resolution of whether he was also entitled to a self-defense-with-deadly-force instruction under section 9.32 is unnecessary. At a minimum, Appellant was entitled to a section 9.31 instruction. Because we have found reversible error in Appellant's first point, resolution of his second point is not necessary to the final disposition of this appeal. Accordingly, we need not address the section 9.32 portion of his first point or his second point. *See* Tex. R. App. P. 47.1.

Having sustained Appellant's first point, we reverse the judgment of the trial court and remand the cause for a new trial.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

PUBLISH

DELIVERED:  November 12, 2015