# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00669-CR

**John Christopher Foster, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT NO. D-1-DC-17-201020, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

John Christopher Foster was charged with aggravated assault family violence for allegedly assaulting Sarah Morris, who Foster had a dating relationship with at the time, and for using a deadly weapon during the offense. *See* Tex. Penal Code §§ 22.01(a) (listing elements of offense of assault), .02(a)-(b)(1) (providing that defendant commits aggravated assault if he "causes serious bodily injury to another" and that offense is first-degree felony if defendant uses deadly weapon "and causes serious bodily injury to a person whose relationship to or association with the defendant is described by" provisions of Family Code). During the trial, Foster requested a jury instruction on self-defense, but the district court denied that request. At the end of the guilt-or-innocence phase, the jury found Foster guilty of the charged offense and also found that Foster used a deadly weapon during the offense. At the end of the punishment phase, the jury assessed Foster's punishment at seventeen years and six months' imprisonment. *See id.* § 12.32 (listing punishment

range for first-degree felony). The district court rendered its judgment of conviction in accordance with the jury's verdicts. In two issues on appeal, Foster argues that the district court erred by denying his request for an instruction on self-defense and by failing to convene a hearing on his motion for new trial. We will reverse the district court's judgment of conviction and remand for further proceedings.

## BACKGROUND

As set out above, Foster was charged with aggravated assault family violence. Originally, the indictment alleged that Foster assaulted Morris by "intentionally, knowingly, and recklessly caus[ing] serious bodily injury to . . . Morris" in the following different ways: (1) "by grabbing . . . Morris with his hand," (2) "by squeezing . . . Morris with his hand," (3) "by striking . . . Morris with his hand," (4) "by pulling . . . Morris'[s] hair," and (5) "by cutting . . . Morris with a knife." The indictment also alleged that Foster committed the assault while using and exhibiting a deadly weapon (a knife). After the various witnesses testified at trial, the State abandoned the first three alternative assault allegations. Consistent with the remaining allegations, the jury charge instructed the jury to find Foster guilty if they determined that Foster "cause[d] serious bodily injury to . . . Morris . . . by . . . pulling . . . Morris'[s] hair[] or . . . cutting . . . Morris with a knife."

During the trial, Foster, Morris, Morris's neighbor, several medical personnel, and numerous law-enforcement officials testified. In addition, photographs of Morris's home and of injuries that Morris and Foster allegedly sustained were admitted into evidence. The photographs of Morris's home show blood, clumps of hair, and feces in several rooms. The photographs of Morris showed significant injuries to her face and head, including an injury to her scalp. Two photographs

2

taken of Foster on the day of the offense showed lacerations on his neck, and a photograph taken well after the offense purportedly showed a scar from an injury to Foster's armpit.

Furthermore, recordings of phone conversations between Foster and two individuals occurring while he was in jail and of a 911 call made by Morris's neighbor were admitted into evidence. On the recording of the 911 call, Morris's neighbor stated that Foster was beating Morris, that Morris knocked on the neighbor's door for help, and that the neighbor could hear Morris screaming and pleading with Foster to stop. On the recordings of the phone conversations from jail, Foster stated that he took a knife away from Morris after she held the knife to his throat, that his throat was cut when he pushed against the knife, that he cut his hand in the process, and that he cut Morris's hair.

During her testimony, Morris explained that Foster had assaulted her throughout their relationship by punching her in the face and that this occurred as recently as one week before the incident in question. Regarding the day of the alleged offense, Morris explained that Foster brought two knives to her before she was going to take a bath and told her how to kill herself, that he started yelling at her about the fact that he could not find his cell phone, that he left her home, and that she locked the door when he left. In addition, Morris related that Foster returned a few minutes later, "busted [the front door] open" while she was still in the living room, "start[ed] punching" her in the face, and strangled her neck with two hands. Further, Morris recalled that she felt her life "slipping away" while she was being strangled, that she thought she "was going to die," that she could not breathe, and that she "defecated [her]self" at some point.

3

Next, Morris explained that Foster stopped choking her to continue looking for his phone and that, at that point, she ran to her neighbor's house. Moreover, Morris stated that Foster grabbed her "by [her] hair and drag[ged her] back into the house," that he used a knife "to cut off [her] hair," that she fought for the knife and cut her hands during the struggle, that she held the knife to his neck and told him to stop, that Foster started laughing and regained possession of the knife, and that Foster said he was going to kill her. Additionally, Morris testified that she asked Foster to let her take a bath to clean herself, that Foster agreed but stated that he would stay in the bathroom with her and hold onto the knife, that Foster passed out because he was intoxicated, that she grabbed the knives and placed them in the bathtub, that the police showed up shortly thereafter, and that she left the home when the police arrived. Further, Morris specifically denied attacking Foster first.

In addition to Morris testifying, the State called Officer Matthew Murphy to the stand to discuss his observations on the night in question when he responded to a 911 call concerning Morris. Officer Murphy related that he first noticed blood on the front porch and doorframe, that he went inside the residence and saw more blood and also clumps of hair in the living room, that he observed Foster unconscious in the hallway with blood on his hand, that Foster "had long hairs stuck underneath" his fingernails, and that Foster "had some lacerations to his neck." Next, Officer Murphy recalled that he heard Morris call for help; that "she had swelling, discoloration, and blood covering the majority of her face"; that some of her hair was missing; that she had a laceration on her head; and that she had "red marks on her neck." When describing the extent of Morris's injuries, Officer Murphy stated that Morris had "significant swelling to the majority of her face" causing one of her eyes to be nearly swollen shut and that a large "area of skin . . . was completely missing

4

from her scalp." In addition, Officer Murphy testified that he found "two, possibly more, knives" in the bathtub.[1]

Following Officer Murphy's testimony, a paramedic, David Curvin, was called to the stand to discuss his treatment of Morris. Regarding Morris's injuries, Curvin explained that she had swelling to both eyes, had bruising on her face, had lacerations to her throat and left hand, had bruises on her knees, and "had an area on the back of her head where somebody had sliced a large portion of her scalp off." Regarding the last injury, Curvin explained that if the wound was not treated, it "could [have] become infected" and "could eventually [have] kill[ed] the patient." In addition, Curvin related that Morris told him that she had been "repeatedly struck with fists and the butt or handle of a knife" and that Foster tried to cut her hair off. When discussing the injuries to Morris's left hand, Curvin discussed how Morris told him that she injured her hand when "trying to get the knife away from" Foster and when "fighting off [Foster] . . . with his knife." Moreover, Curvin testified that Morris stated that Foster choked her to the point where she "almost passed out," that she was so scared during the incident that she defecated on herself, and that she thought that Foster "was going to kill" her.[2]

Next, the State called Detective Alfonso Anderson to the stand, and he testified that he went to the scene of the offense and spoke with Foster and Morris. When discussing his conversation with Foster, Detective Anderson related that Foster had long but "very superficial"

---

[1] Testimony similar to that of Officer Murphy's was given by Officer Matthew Hootman, who also responded to the scene on the night in question.

[2] One of the nurses who treated Morris on the night in question, Kimberly Conklin, was called to the stand and provided similar testimony regarding the extent and nature of Morris's injuries.

"scratch marks along his throat," that Foster's hands looked swollen, and that Foster had cuts on his fingers. Regarding the injuries to Foster's hands, Detective Anderson stated that swollen hands can be a sign that the person has hit something with his hands, but Detective Anderson also testified that some of the injuries might have been defensive in nature. Additionally, Detective Anderson discussed how when he talked with Morris, she stated that she gathered the knives and placed them in the tub to hide them because she was afraid Foster was going to kill her. Further, Detective Anderson testified that Morris stated that Foster tripped her, got on top of her, punched her, and strangled her for two minutes, and Detective Anderson recalled that Morris also recounted that she defecated when she was being strangled, that Foster let her go for a moment, that she ran to her neighbor's home seeking help, that Foster brought her back to the house, that Foster picked up a knife, that Foster started "cutting her hair off," that he held the knife to her throat, and that he threatened to kill her. In addition, Detective Anderson recalled that Morris initially expressed concern that she might be charged for cutting Foster's neck.[3]

During his case in chief, Foster elected to testify and was called to the stand two times. In his first appearance on the stand, Foster admitted that he was seeing another woman and testified that on the night before the alleged offense, Morris wanted him to watch her have sex with another man to punish him for the affair. Further, Foster stated that he decided to leave Morris's home but that before he left, Morris grabbed his stuff and tackled him in the front yard in order to keep him from leaving. Regarding the day of the offense, Foster related that they had sexual

---

[3] In his testimony, Detective Anderson provided testimony similar to that given by other witnesses describing the scene and Morris's injuries.

intercourse but started to argue afterwards. When describing the argument, Foster recalled that he was "being a jerk to her" by saying "mean" things, that she threatened to kill herself, that she grabbed a knife, and that she "started to cut her hair off." Next, Foster recalled that Morris attacked him by cutting his neck, hand, and armpit with a knife.

Additionally, Foster testified that he defended himself because he believed that Morris was going to kill him, that they struggled for the knife, that she was holding the knife very close to herself, and that she sustained injuries from the knife during their struggle to get control of the knife. Regarding those injuries, Foster related that the knife made contact with Morris's body more than once resulting in a cut to her chin. When asked about some of the injuries to Morris's head, Foster denied "scalp[ing] her" but stated that "her hair could have gotten cut" during their struggle because she was holding the knife "close to her." In addition, Foster stated that he hit her and tried to hold her down by the neck when trying to get the knife, that he gained control of the knife, and that he threw the knife away. Finally, he denied assaulting her in the past but admitted that he hit her a couple of times after she hit him first.

After Foster finished testifying the first time, the district court stated that Foster "messed up [his] self-defense" because, according to the district court, the indictment charged Foster "with stabbing [Morris] with a knife and cutting her hair off," "because [he had] to admit to the conduct" to get the instruction, and because Foster did not admit to committing the charged conduct. Following that exchange, Foster was called to the stand again. In his testimony, Foster admitted that he cut Morris's "hair with a knife" during "the struggle."

7

Following his second round of testimony, Foster again requested an instruction on self-defense in light of the district court's prior explanation for why Morris was not entitled to a self-defense instruction and in light of Morris's subsequent testimony admitting to cutting Morris's hair with a knife. In response, the district court denied the request and stated that Foster's admission that he cut Morris's hair was "not enough" because Foster did not testify that he cut her hair in response to her aggression.

After the jury charge was prepared and after the jury considered the evidence presented during the trial, the jury found Foster guilty of the charged offense.

## DISCUSSION

In his first issue on appeal, Foster contends that the district court erred by denying his request for a jury instruction on self-defense. In his second issue on appeal, Foster argues that the district court erred by failing to convene a hearing on his motion for new trial. Given our resolution of Foster's first issue on appeal, we need not reach the second issue.

### Self-Defense Instruction

As indicated above, Foster contends that there was error in the jury charge. When reviewing an alleged jury-charge error, appellate courts first determine whether error exists and then, if so, ascertain whether the resulting harm is sufficient to warrant a reversal. *See Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The amount of harm needed for a reversal depends on whether a complaint regarding "that error was preserved in the trial court." *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin

8

2008, pet. ref'd). If the defendant made a timely objection, reversal is required if there has been "*some* harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). However, if no objection was made, a reversal is warranted only if the error resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

During trial, Foster requested an instruction on self-defense. "Self-defense is a justification for otherwise unlawful conduct." *Torres v. State*, 7 S.W.3d 712, 714 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Under the Penal Code, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code § 9.31(a). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

When determining whether a defensive instruction should have been provided, appellate courts "view the evidence in the light most favorable to the defendant's requested" instruction. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). In general, a defendant is entitled to a jury instruction on a defensive issue if the defensive issue "is raised by the evidence, regardless of the strength or credibility of that evidence." *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013). However, an instruction "is not required" if the evidence "does not establish the defense." *Williams v. State*, Nos. 03-14-00228—00229-CR, 2016 WL 370019, at \*4 (Tex. App.—Austin Jan. 27, 2016, no pet.) (mem. op., not designated for publication). "A defendant's testimony alone may be enough to require a self defense instruction." *Maxwell v. State*, No. 03-06-00473-CR, 2007 WL 2274883, at \*2 (Tex. App.—Austin Aug. 6, 2007, pet. struck) (mem. op., not

designated for publication). "A trial court errs in denying a self defense instruction if there is some evidence, from any source, when viewed in the light most favorable to the defendant, that will support the elements of self defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law." *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

"In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Id.* "[W]hen the defensive evidence merely negates the necessary culpable mental state, it will not suffice to entitle the defendant to a defensive instruction." *Id.* at 659. "Rather, a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." *Id.*; *see also Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010) (explaining that doctrine of confession and avoidance "requires an admission to the conduct, which includes both the act or omission and the requisite mental state"). However, "[a]dmitting to the conduct does not necessarily mean admitting to every element of the offense." *Gamino*, 537 S.W.3d at 512. "For example, a defendant" can essentially admit to the commission of murder but still deny "an intent to kill." *Id.*

Viewing the evidence in the light most favorable to Foster's requested instruction, evidence was presented during the trial indicating that Morris had physically tackled Foster on the day before the alleged offense; that Morris initiated an assault on the day in question by using a knife to cut Foster on his neck, hand, and armpit; and that Morris expressed concern that she might be

10

charged for the injuries that she inflicted on Foster. In addition, photographs were admitted into evidence showing that Foster had a laceration on his neck on the night in question and showing that Foster had a scar near his armpit. Furthermore, Foster testified that he believed that Morris was going to try and kill him and decided to try to take the knife from Morris by wrestling it away from her. Additionally, Foster admitted that as a result of that struggle, Morris sustained cuts to various parts of her body.

In its brief, the State asserts that the evidence summarized above is insufficient to have warranted a self-defense instruction because Foster "did not admit to scalping" Morris, which the State urges Foster was required to do in order to be entitled to an instruction. As support for this proposition, the State notes that Foster was charged with aggravated assault, which requires proof of serious bodily injury, *see* Tex. Penal Code § 22.02 (providing that person commits aggravated assault by committing assault that "causes serious bodily injury to another"), and urges that "the only injury that qualified as 'serious bodily injury'" based on testimony given at trial "was an injury on the back of [Morris]'s head where someone sliced off a large portion of her scalp," *see also id.* § 1.07(a)(46) (defining "'[s]erious bodily injury'" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ").[4]

---

[4] As support for these arguments, the State primarily relies on two prior opinions from this Court. *See Guzman v. State*, No. 03-13-00131-CR, 2015 WL 2400238 (Tex. App.—Austin May 13, 2015, pet. ref'd) (mem. op., not designated for publication); *Maxwell v. State*, No. 03-06-00473-CR, 2007 WL 2274883 (Tex. App.—Austin Aug. 6, 2007, pet. struck) (mem. op., not designated for publication). In both of those cases, the defendants admitted to some conduct, but they both denied that their actions injured the alleged victims. *See Guzman*, 2015 WL 2400238, at *11 (observing that "although appellant admitted that he struggled with Gay for the gun, he did not admit that he

11

As an initial matter, we note that the indictment did not allege that Foster caused an injury to Morris's scalp; rather, the indictment asserted alternative means in which Foster allegedly committed aggravated assault, including cutting Morris with a knife. Moreover, as described above, Foster admitted that as a result of his struggle to get the knife away from Morris, Morris sustained cuts from the knife, including cuts to her chin and to "her hair." Accordingly, although his testimony is inconsistent, Foster admitted to the criminal conduct alleged in the indictment of cutting Morris with a knife and arguably admitted to causing an injury to her scalp. *Cf. Miller v. State*, 312 S.W.3d 209, 213 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (explaining that determination regarding whether injury constitutes serious bodily injury is "a question of fact for the jury to decide").

Moreover, assuming for the sake of argument that Foster did not admit to causing the injury to Morris's scalp that served as the focus for much of the testimony presented at trial, that would not compel a conclusion that Foster was not entitled to a self-defense instruction in the circumstances present here, particularly where Foster did admit, consistent with the charges presented in the indictment, that his actions resulted in Morris being cut with a knife. On the contrary, the court of criminal appeals has indicated that a defendant is "'not required to concede the State's version of the events' in order to be entitled to a self defense instruction." *See Gamino*,

committed the assaultive conduct alleged" because he "repeatedly denied ever hitting or kicking Gay, adamantly maintained that he did not cause her injuries, asserted that the injuries were self-inflicted by Gay, and suggested that the injuries were caused by other objects (such as the mailboxes) during their struggle over the gun"); *Maxwell*, 2007 WL 2274883, at *2 (noting that "although Maxwell admitted that he struggled for a gun, he did not admit that he fired the gun or that he fired the shot that killed Ramirez"). In contrast, in this case, although his testimony was inconsistent, Foster did admit that his actions resulted in Morris being cut multiple times with a knife when he struggled with Morris in order to take the knife away from her, and the indictment in this case alleged that Foster cut Morris with a knife.

537 S.W.3d at 512 (quoting *Gamino v. State*, 480 S.W.3d 80, 88 (Tex. App.—Fort Worth 2015), *aff'd*, 537 S.W.3d 507). Moreover, opinions by our sister courts of appeals have also indicated that if a defendant admits to using force against an alleged victim, as provided under the self-defense provision of the Penal Code, *see* Tex. Penal Code § 9.31(a), he should not "be denied the defense simply because he refused to admit to using the type of force alleged by the State," *see Holloman v. State*, 948 S.W.2d 349, 352 (Tex. App.—Amarillo 1997, no pet.) (commenting that "[i]t would be nonsensical to prohibit the defendant from claiming self-defense" if he admitted to using force in manner different from that alleged in indictment); *see also Hubbard v. State*, 133 S.W.3d 797, 801-02 (Tex. App.—Texarkana 2004, pet. ref'd) (stating that "even if a defendant denies the specific allegations in the indictment, he or she is not necessarily precluded from raising defensive issues as long as he or she sufficiently admits conduct underlying the offense and provides evidence justifying a defensive instruction"); *Torres*, 7 S.W.3d at 716 (determining that defendant raised issue of self-defense even though he denied "intentionally and knowingly causing bodily injury to" his wife because he admitted "to grabbing his wife by her hair, possibly hitting her in the face . . . , struggling with her, and pushing her away").

In light of the preceding and given the standard by which we are required to review this type of alleged jury-charge error, we conclude that evidence was presented that Foster reasonably believed that his use of force was immediately necessary to protect himself against Morris's use of unlawful force and conclude that the district court erred by not submitting a self-defense instruction. *Cf. Alonzo v. State*, 353 S.W.3d 778, 780, 783 (Tex. Crim. App. 2011) (determining that testimony from defendant that victim "attacked him with . . . a metal object, that the two engaged in a struggle,"

13

that victim grabbed spike, that victim attacked defendant with spike, that they struggled for control of spike, and that next thing defendant knew was that victim had "a hole in his chest" that "must have happened during the struggle" when they "were so close fighting" was sufficient "to raise the issue of self-defense"); *VanBrackle v. State*, 179 S.W.3d 708, 714 (Tex. App.—Austin 2005, no pet.) (noting that "[w]hether the events in question actually transpired in the manner described by the defensive testimony and whether appellant's conduct was reasonable under the circumstances are fact issues to be determined by a jury").

Having determined that there was error in the jury charge, we must now determine whether Foster was harmed by the error. As set out above, Foster's request for the instruction was denied by the district court, and we, accordingly, assess whether Foster suffered some harm by the omission. *See Jiminez v. State*, 953 S.W.2d 293, 299 (Tex. App.—Austin 1997, pet. ref'd). In this type of analysis, reviewing courts "consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Although the standard is less stringent than the analysis performed when an objection is not made, the reviewing court must still "find that the defendant 'suffered some actual, rather than merely theoretical, harm from the error.'" *Id.* (quoting *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008)). If there has been an objection, a reversal is warranted when the error is "calculated to injure the rights of the defendant." *Id.* (quoting *Almanza*, 686 S.W.2d at 171). "In other words, a properly preserved error will require reversal as long as the error is not harmless." *Gamino*, 480 S.W.3d at 90.

Moreover, we note that the absence of a confession-and-avoidance-defense instruction "is generally harmful because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013); *see also id.* (stating that "[i]n general, when there is a single offense tried before a jury, it is impossible to determine how a jury would have weighed the credibility of the evidence on a defensive issue, and, therefore, appellate courts have reversed convictions in order to permit the jury to decide whether it believes the defensive evidence"). In addition, we note that if the issue of self-defense is raised by the evidence, the State has the burden of proving "beyond a reasonable doubt that the defendant did not act in self-defense." *VanBrackle*, 179 S.W.3d at 717 (citing Tex. Penal Code § 2.03(d)). In other words, "[h]ad the jury in this cause been properly instructed, it needed only to have a reasonable doubt as to whether [Foster]'s actions were justified by self-defense to render an acquittal." *Id.*

Turning to the first factor, the district court denied Foster's request for an instruction on self-defense. As a result, the jury was not given the opportunity to consider whether the evidence regarding Foster's alleged use of force could be legally justified as self-defense and had no option of acquitting Foster of the charges in light of his admissions. *See Dugar v. State*, 464 S.W.3d 811, 822 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (explaining that when self-defense "instruction was taken away from the jury, appellant was left without his only defensive theory, making his conviction a virtual inevitability"). Accordingly, this factor weighs in favor of a determination that Foster was harmed by the error.

Regarding the parties' arguments, Foster discussed self-defense during his opening and closing statements. In particular, he asserted during his opening statement that the evidence

15

would show that Morris was the aggressor, that Morris assaulted Foster with a knife first, and that Foster fought back to "protect his life," and Foster also related that the jury should consider his "evidence of self-defense" when making their determination. In his closing arguments, Foster attacked the victim's credibility and urged that the State had not proved its case beyond a reasonable doubt, but Foster also noted that there was no self-defense instruction in the jury charge and that he could not argue self-defense in this case. Moreover, the State in its closing referenced the portions of Foster's testimony in which he admitted that his actions resulted in Morris being cut. Accordingly, this factor would seem to weigh in favor of a determination that Foster was harmed by the absence of a self-defense instruction in the jury charge.

Turning to other portions of the record, we note that during voir dire, the State and Foster both emphasized self-defense. In particular, the State listed the elements of the defense and provided examples of when self-defense might and might not be warranted. Additionally, Foster focused on self-defense and extensively questioned the panelists about whether they could entertain a self-defense instruction when the defendant is a man and when the alleged victim is a woman. Further, the district court explained during voir dire what the elements of self-defense are and stated that if the elements were met, then there would be an instruction for that defense in the jury charge. Later, the district court went through the elements again after displaying the statutory provision for the jury panelists to examine, questioned the panel about whether they thought that "a man can't ever have a self-defense claim against a woman," and discussed what types of force would be considered a reasonable response to an attack. Given the focus on self-defense and in light of the district court's statement that an instruction would only be provided if the evidence warranted an instruction, we

16

believe that this factor weighs in favor of a determination that Foster was harmed by the omission. *Cf. Johnson v. State*, 271 S.W.3d 359, 368 (Tex. App.—Beaumont 2008, pet. ref'd) (noting as part of harm analysis that defendant questioned jury panel on defensive theory).

Regarding the evidence presented at trial, we note, as summarized above, that Foster admitted in his testimony to using force against Morris that resulted in Morris being injured and asserted that he was defending himself against Morris's alleged assault, and photographs of injuries that Foster purportedly sustained on the night in question were admitted into evidence and shown to the jury. In addition, Detective Anderson testified that Foster may have had defensive wounds to his hands and that Morris expressed concern that she might be charged for her conduct on the night in question. Moreover, on the recordings of Foster's phone conversations, Foster stated that Morris held the knife to his throat.

Unquestionably, other evidence was presented during trial indicating that Morris did not assault Foster on the night in question and significantly undermining Foster's claim of self-defense. However, in light of the evidence raising the issue of self-defense, of our resolution of the factors discussed above, and of the governing case law indicating that the denial of a defensive instruction in cases involving a single offense is generally harmful, *see Cornet*, 417 S.W.3d at 451, we cannot conclude that the absence of a self-defense instruction was harmless under the circumstances present here.

For all of these reasons, we conclude that the district court erred by denying Foster's request for a self-defense instruction and that the failure to provide that instruction resulted in some harm to Foster. *Cf. Johnson*, 271 S.W.3d at 368-69 (determining that defendant was harmed by

17

absence of defensive instruction where defendant admitted that she stabbed victim "to stop him from jumping on her or hitting her" but where "jury was not instructed to consider" defensive theory, which prevented jury from considering acquitting defendant "by reason of her immediate need to defend herself"); *VanBrackle*, 179 S.W.3d at 717 (concluding that trial "court's refusal to instruct the jury on self-defense caused some harm to appellant" despite significant deficiencies in defensive evidence). Accordingly, we sustain Foster's first issue on appeal.

Having sustained Foster's first issue on appeal, we need not address Foster's second issue on appeal.

## CONCLUSION

Having sustained Foster's first issue on appeal, we reverse the district court's judgment of conviction and remand for further proceedings consistent with this opinion.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Reversed and Remanded

Filed:   July 24, 2018

Do Not Publish

18