

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00063-CR

_____

JOE PEARL WINDHAM, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 59,187-B

_____

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

This is an alleged road-rage case in which the only eyewitnesses were the complainant, the accused, and the accused's adult son, who was a passenger in the accused's pickup at the time of the incident. The jury was presented with differing stories from which it had to piece together the true facts of the event. The accused, appellant Joe Pearl Windham, attempted to raise self-defense as a justification for his actions, but the trial court denied his request for a self-defense instruction to the jury. Based on our review of the entire record, we conclude that the trial court erred by refusing Windham's requested self-defense instruction and that this refusal caused Windham some harm. Accordingly, we reverse Windham's conviction for aggravated assault with a deadly weapon and remand the case for a new trial.

## I.    PROCEDURAL BACKGROUND[1]

Law enforcement responded to a 911 call about a person in a pickup pointing a gun at a tractor-trailer driver. A Clay County Sheriff's Deputy pulled over the pickup driver, Windham; conducted an investigation that included talking to Michael Horton, the tractor-trailer driver; and arrested Windham. A grand jury later indicted Windham for aggravated assault with a deadly weapon, alleging that Windham had "intentionally or knowingly threaten[ed] . . . Horton with imminent bodily injury by pointing a firearm at or in the direction of" Horton while using or exhibiting a deadly weapon.

---

[1]Because our discussion of Windham's complaints on appeal requires a thorough review of the evidence at trial, we provide a more detailed explanation of that evidence in our analysis of those complaints.

After a trial at which Horton and Windham were the primary witnesses, a jury convicted Windham of aggravated assault and assessed his punishment at five years' confinement and a $5,000 fine. However, the jury also recommended that Windham's sentence be suspended and that he be placed on community supervision. The trial court sentenced Windham in accordance with the jury's verdict, placing him on two years' community supervision.

## II. ISSUES ON APPEAL

Windham brings five issues on appeal. In two of his issues, Windham challenges the sufficiency of the evidence to support his conviction, and in the other three issues, he challenges the trial court's denial of his requested jury instructions on nondeadly-force self-defense, deadly-force self-defense, and necessity. We will address his sufficiency issues first because they could afford him the greatest relief if sustained. *See Roberson v. State*, 810 S.W.2d 224, 225 (Tex. Crim. App. 1991) (per curiam).

## III. SUFFICIENCY OF THE EVIDENCE

In his first issue, Windham argues that the evidence is insufficient to prove beyond a reasonable doubt that he committed aggravated assault with a deadly weapon. We disagree.

### A. Standard of Review and Applicable Law

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found

3

the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is

4

authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

As applicable here, a person commits aggravated assault if the person intentionally or knowingly threatens another with imminent bodily injury and in doing so uses or exhibits a deadly weapon. Tex. Penal Code Ann. §§ 22.01(a)(2), 22.02(a)(2). Thus, we must determine if the evidence supports a determination beyond a reasonable doubt that Windham used or exhibited a deadly weapon to intentionally or knowingly threaten Horton with imminent bodily injury. *See id.*; *De Leon v. State*, 865 S.W.2d 139, 142 (Tex. App.—Corpus Christi–Edinburg 1993, no pet.).

**B. Evidence at Trial**

The events at issue occurred on June 6, 2017, during evening rush-hour traffic in Wichita Falls, as Windham and Horton were traveling on an elevated portion of southbound Highway 287 known as the flyover. The flyover has two constant lanes of travel, but because it also has on-and-off ramps that merge onto or split away from

5

the highway on both sides, it has two, three, or four lanes of travel depending on the driver's location.

Horton was driving a Peterbilt truck with an attached trailer that together were eight feet, six inches wide and seventy-nine-feet long. Horton was the only occupant of his vehicle, but he had been traveling with another driver, Danny Williams, who was driving in his own, nearly identical Peterbilt. Horton had lost sight of Williams in Burkburnett and did not know where he was when the incident occurred. Windham was driving a pickup and was hauling a thirty-five-foot long ocean-going boat that weighed about six to seven thousand pounds. Windham's adult son Chad was sitting in the front-passenger seat, and his other adult son Chance was sitting in the passenger-side back seat.

### 1.    Horton's testimony

Horton testified that he traveled on Highway 287 through Wichita Falls three or four times a month and usually stayed in the second lane from the left (lane 2) while driving through because that lane continues straight through the city. Horton said that he first noticed Windham's pickup upon entering the flyover. According to Horton, the flyover had three lanes at that point; Horton was in the middle lane (lane 2), and the pickup was in the right lane (lane 3). As Horton was about to pass the pickup and boat, the pickup driver sped up, "jumped over in front of" Horton, and then immediately slowed down, causing Horton to slow down. The pickup then moved back over to the right, into lane 3. Horton sped up to go around the pickup,

but the pickup driver sped up again, moved back in front of Horton, slowed down, and then moved back over into lane 3. Although lane 3 becomes an exit ramp at Highway 82, reducing Highway 287 to only two lanes before a right-side on-ramp widens it again to three, Horton said that these events occurred before that location. Horton testified he was driving fifty-five or sixty miles per hour during this part of the encounter.

According to Horton, he stayed in lane 2 to continue on southbound Highway 287. After they passed the Highway 82 exit, the pickup was in front of him in lane 2. After the road widened again to three lanes, the pickup then moved over into the right lane (lane 3), and as Horton pulled alongside the pickup to pass, the same thing happened: "he pulled ahead of me and went back over." Horton then passed the pickup.

The pickup driver, still in lane 3, then passed Horton and did the same thing: moved over into lane 2 from lane 3, slowed down, and moved back over into lane 3. Before lane 1 became a left-side exit ramp, the pickup driver moved the pickup behind Horton and then into lane 1. As the pickup moved alongside Horton's driver's side window, Horton saw a "pistol hanging out the window--or pointing up at [him] from inside the" pickup in front of the front-seat passenger; the driver was holding the pistol. Horton was "[s]ort of" looking down the barrel of the gun because his seats rode higher than the pickup. Horton described the pistol as "a . . . blue[-]barrel

7

revolver." Horton could see the driver's face and identified Windham as the person who had pointed the gun at him. Horton testified that he felt threatened by the gun.

Horton testified that he then let off the accelerator and leaned back in his seat to "get[] as far away from [the gun] as [he] could and mak[e] [himself] less visible." The pickup driver then pulled away and moved down the road. Horton called 911 but continued to follow the pickup, letting it "get some distance" from him.

Horton denied pushing the pickup into another semi-truck, crowding it into another lane, or cutting it off. He did not recall anything about a "near collision." He also denied making any rude or obscene gestures, being aggravated by or mad at the pickup driver's cutting him off, or taking any aggressive actions himself.

2.     **The 911 call**

The trial court admitted the recording of Horton's 911 call into evidence. When the operator asked Horton, "What'd he'd point [the gun] at you for?" Horton answered,

> I have no idea. All I know is he, he cut me off, and then he got back over in the other lane and slowed down, and I went ahead and passed around him. Next thing I knew, he comes speeding up beside me sticking his pistol out the window at me.

Horton explained in more detail that

> he was coming in through town in, uh, slow traffic, and I went around, and next thing I know he shoots up beside me and *cuts me off* and then slows back down, and I just went ahead, . . . I had my cruise control set and I just went back around him. And next thing I know we're coming out of town and he's speeding beside me and I've got a pistol hanging out the window at me. [Emphasis added.]

8

The 911 operator instructed Horton to pull over when the officers pulled over the pickup driver. Horton also explained to the operator that he was traveling with another driver:

| | |
|---|---|
| 911 operator: | "You're in a black Peterbilt semi?" |
| Horton: | "Yes." |
| 911 operator: | [Talking over dispatch] "RP is going to be in a black Peterbilt semi." |
| Horton: | "There's two of us though, don't get - I'm the one in front." [laughs] |
| 911 operator: | "He's advising that there are two of him, uh, there's another one that looks like his but he's gonna be the front." |

### 3.    Deputy William Norris and Norris's dash-cam video

Clay County Sheriff's Deputy[2] William Norris testified that he stopped the pickup in response to the 911 call. According to Deputy Norris, the driver and his two passengers claimed that they had been involved in an altercation with another vehicle in which the pickup's right, side-view mirror hit an eighteen-wheeler.[3] Deputy Norris testified that he did not see any damage to the passenger side of the boat or damage to the pickup and that there was no evidence of contact on the pickup's right-hand mirror. Deputy Norris did not compare the left- and right-hand mirrors, though,

---

[2]By the time of trial, Deputy Norris worked for the Electra Police Department.

[3]As explained below, Windham's story is that where lane 3 of the flyover ends as an exit ramp to the right, Horton (in lane 1) forcefully pushed Windham's pickup (in lane 2) into the far-right lane (lane 3) and into a red truck.

to determine if the right-hand mirror had been pushed in. He admitted that he could not speculate whether the mirror had been disturbed.

The trial court admitted footage from Deputy Norris's dash-cam into evidence. After Windham stopped, he almost immediately stated, "I got out of his way . . . [unintelligible]. Then he come and chased me down, ran me into [unintelligible]." Windham told Deputy Norris, "He ran me off the road. . . . [R]an me into the other truck. Tried to crush us between two trucks." Windham then said,

> He, he came over in my lane twice. . . . All I did was pull up, accelerate to go out and get in front of him. . . . I have no earthly idea what pissed him off at that. I wasn't that close, I do not believe so. But then he come and chase me down and, and ran me into another truck. I mean, he came to get me.

Later in the video, Windham again told Deputy Norris that he had hit the other truck with the pickup's passenger-side mirror: they "touched." Windham told the officer, "[T]he guy tried to kill me . . . between two trucks. Tried to kill my kids." He repeatedly stated that the other driver had "attacked" him with his tractor-trailer. Windham also elaborated,

> That was assault with a deadly weapon. That automobile, he used that damn truck. He, he might as well've pulled a knife, a gun, or something like that. . . . That's attempted murder of three people, in my opinion. I wouldn't have reacted so badly. I would have been able to call. I wouldn't have gotten so choked up. . . . I know they're grown men to you, but they're still my babies. . . . He damn near wiped out my whole family. [Deputy Norris's interjecting remarks omitted.]

When Deputy Norris asked Windham if he had tried to speed up to get away from the other driver, Windham responded,

[H]e chased me down. I've got a boat. I'm in a half-ton truck with a 24-foot boat. I can't, I can't run, I can't hide. . . . He was running off the side of the road on the corner with his . . . trailer. I tried to speed up and get around him and get in front of him. And he come and chased us down and ran me into that other damn truck.

Windham also told Deputy Norris that he had tried to call 911, but that he did not connect. Chad said that he did not call 911.

Windham denied pointing his gun at the other driver. He also denied reaching across the front seat and pointing a gun up at the other driver, stating, "No, I did not. I did, I did throw him the finger, I did throw him my fist. I did . . . rage. I did tell him, 'f[***] you, m[***** ******], g[*******] tried to kill us.'" When the officer later again asked, "Did you ever point the weapon at him?," Windham responded, "No. I, I pointed my finger at him, I shook . . . my fist at him, we all did. I rolled the window down and screamed at him. Why, 'You, you tried to kill us! What the f[***] is wrong with you?' That's exactly what I said." Windham then added, "I had my iPad in my hand. I pointed my iPad at him."

### 4.    Clay County Sheriff's Sergeant Jody Polvado and Polvado's dash-cam video

Clay County Sheriff's Sergeant Jody Polvado assisted in the traffic stop of the pickup. He testified that he searched for, located, and took possession of a fully loaded black revolver with a long barrel.[4] The sergeant testified that he looked over

---

[4]The sergeant testified that Windham had a license to carry and was certified to carry a gun.

the pickup "pretty thoroughly" and "didn't see any damage at all," including on the passenger-side mirror. Sergeant Polvado also admitted, however, that he did not operate the electronic extension to make the mirrors go out and in; he just visually examined them. He did not observe one mirror's being pushed in closer than the other.

Sergeant Polvado also spoke with Horton after he had pulled over as instructed by the operator. Sergeant Polvado testified that Horton told him that Windham had cut in front of him so closely that he could not see the motors on the boat. In the video from Sergeant Polvado's dash-cam, Horton described what his tractor-trailer's dash-cam would have shown had it been recording that day[5]: "It woulda showed that they cut me off. . . . I couldn't even see the back-end of the motors on the boat. . . . Like I said, after that, he just jumped over in the right-hand lane, and I just kept on going, went on past him."

Sergeant Polvado also interviewed Williams, who had stopped to check on Horton. According to Sergeant Polvado, Williams told him that he was so far behind Horton that he did not witness anything.

### 5. Trooper Benjamin Wolf and Wolf's dash-cam video

Department of Public Safety Trooper Benjamin Wolf testified that by the time he arrived, Horton's and Williams's two commercial tractor-trailers were parked on

---

[5]Horton explained at trial that although his tractor-trailer is equipped with a dash-cam, it did not record that day's events because it had been locked inadvertently.

the side of the roadway shoulder.[6] Trooper Wolf's dash-cam video showed Sergeant Polvado giving Trooper Wolf information about the incident and then both officers having a largely unintelligible conversation with Horton. After that conversation, Trooper Wolf told Sergeant Polvado: "If they did sideswipe, there's no reason to pull a gun."

Trooper Wolf testified that when he asked Horton if he felt threatened by Windham's actions, Horton responded, "No, I was pissed." Trooper Wolf admitted that before he interviewed Windham, he had already told Horton that he was going to arrest Windham, most likely for "ag assault," based on Horton's statement. Before interviewing Windham, Trooper Wolf told Horton that he could leave; Horton drove away as Trooper Wolf drove over to where Windham's pickup was parked. Trooper Wolf had previously told Williams he could leave because Williams stated that he had not witnessed anything.

Trooper Wolf testified that he secured the loaded weapon, which he described as a long-barrel Smith and Wesson .38 caliber revolver with a synthetic wooden-type grip with a bluish-black color to it; he testified that Horton's description of the gun on the 911 call matched the gun exactly.

Trooper Wolf interviewed Windham after reading him his *Miranda* rights. The interior dash-cam footage from Wolf's car showed that when Trooper Wolf asked

---

[6]During trial, Trooper Wolf's rank was corporal, but we will refer to him as Trooper Wolf because that was his rank at the time of the offense.

13

Windham what had occurred, Windham responded, "The, the truck driver ran us off the road into another truck. We actually touched the other truck. I do not know what set him off," explaining that his passenger-side mirror had hit the other truck. When Trooper Wolf asked Windham if he had called anybody about the crash, Windham responded that he had tried but that he was driving with the boat and pushing buttons while his phone was locked, adding, "I felt my two kids were, you know, I just got attacked with a deadly weapon so I was a little bit shook up."[7]

Trooper Wolf testified that Windham said that his pickup had been forced off the road and that his passenger-side mirror had "touched" another truck. Trooper Wolf did not see any evidence of damage to the pickup's right-side mirror, and he would have expected to see some indication of contact if the vehicles had been traveling sixty miles per hour. The trooper also admitted that he did not operate the mirrors' motors and could not rule out that Windham's pickup had touched another vehicle on the highway.

Trooper Wolf testified that Windham denied pointing a gun at Horton or displaying a gun. The trooper's dash-cam video also showed Windham denying that anything happened with the gun but having no response to the trooper's asking how Horton could know that there was a gun in Windham's pickup. Windham said that

---

[7]Communications supervisors for the Wichita Falls Police Department and Clay County Sheriff's Office testified that they could not find any 911 calls for a motor-vehicle accident or near-collision around the applicable time on the day of the incident. Horton's call did not mention any motor-vehicle accident or near-collision.

14

the gun was in his console, that Horton had attacked him with his tractor-trailer, that he got "pissed off" at Horton, and that he threw his ipod at Horton and shot him the finger. Windham further complained that the officers had let Horton go, claiming that he had been attacked with the semi-truck because Horton was in a road rage.

Windham explained that he had tried to call 911 and claimed to have "movies" of the incident. Windham then explained that he was going to pull over but that he had not by the time he saw the officers attempting to pull him over. Trooper Wolf remarked that the stop was about twenty miles away from where the incident had happened, and Windham responded: "He's following us. There's two trucks following us, it was all the way. I, I was in fear of my life." He reiterated that Horton had been following them and "had just tried to run [them] off the road."

Trooper Wolf told Windham that the other driver had a dash-cam video, and Windham responded: "I hope he does. I hope he does." Trooper Wolf interjected: "He sure does." Then Windham asked: "Did you see him try to kill us?" Trooper Wolf responded: "No, sir, I did not."[8] Trooper Wolf then arrested Windham for aggravated assault.

The trooper's dash-cam video also showed that after Trooper Wolf arrested Windham, Windham spoke with his sons and told them: "Don't get . . . fuzzy like I

---

[8]Trooper Wolf testified at trial that he was unable to view any material from the SIM card on Horton's dash-cam.

did." Trooper Wolf testified that he took this statement to mean that Windham was saying, "[D]on't do what I did."

### 6. Chad Windham

The defense called Windham's adult son Chad to testify. Chad, who was sitting in the front-passenger seat, testified about the family's encounter with Horton's tractor-trailer and the near-collision:

> [W]e were coming down 287 and we were in the middle lane of the highway. . . . And I believe right at the split, . . . we were moving over into the left-hand lane, and then I guess a truck behind us thought we had cut him off. But we're toting a boat so, you know, we're going 60 miles per hour. . . . We get back into the middle lane. At that time, the truck driver on the left-hand lane pulls forward. I can see him in front of me. He then decides to move into our lane, pushing us into the right-hand lane. On the right-hand lane, there was a red truck. We made contact with that vehicle just as he split. I mean, it was seconds. And that's exactly what happened right there. I don't know where the split was.

Chad testified that their right-hand mirror was pushed in, explaining that it happened just when the red truck split off and that "[i]f he hadn't split off, we would have crashed." According to Chad, Horton pushed them into the red truck without making contact with the driver's side of their pickup or boat:

> Q.    Okay. So did he drift in his lane?
>
> A.    He forcefully pushed us into that red truck.
>
>        . . . .
>
> Q.    . . . . You're saying that he forcefully maneuvered, aggressively, so that your – the vehicle your father was operating contacted the red truck and yet he, in the 79-foot trailer going this way into you, didn't contact your vehicle?

16

A.    Correct.

Q.    Okay. Was the cab of Mr. Horton's vehicle, the truck part, was it past you when he came over?

A.    Yes, sir.

Q.    Okay. So Mr. Horton was ahead of you when he forcefully pushed you and your father and your brother into this red truck and missed you, right?

A.    Yes, sir.

Chad testified that he was "[a]bsolutely" in fear for his life and that he had never been that afraid before. He later testified that he "could have kissed that semi."

Next, according to Chad, their pickup was in the left of two lanes; Horton had slowed down and moved into the right lane. Chad testified that they did not accelerate to catch up with Horton: he had slowed down while they had accelerated to get back up to the speed limit. Chad admitted that if they had "maintained the same speed as Mr. Horton did, then [they] never would have caught him." He also testified that they "sped up to the speed limit and [that they] ended up catching up with him." He further admitted:

Q.    . . . . So y'all, in fact, pursued him and caught him, correct?

A.    We caught up next to him, yes, sir.

Q.    And you drove up along the driver's side of the 18-wheeler, right?

A.    Yes, sir.

Chad denied that they had pursued Horton, again stating that they "eventually caught up with him."

17

According to Chad, Horton was slowing down and as they were passing him, "[a]t this time, out of fear, [Windham] displayed his weapon." Chad admitted that Horton did not take any "aggressive movement" toward them or their vehicle when their pickup came up along Horton's driver's side. Chad further admitted that other than the incident with the red truck, which he viewed as aggressive, Horton did not have any aggression toward the family in the pickup "[a]t [any] other time."

Chad denied that his father pointed the gun at anybody, stating that his father just "shook it." Chad also denied that his father had leaned over him, put the gun across his face, or pointed the gun. When he was asked, "Your dad reached into the center console of the pickup truck and brandished [the gun], didn't he?" Chad answered: "He displayed his weapon, yes, sir." Chad had no recollection of his father's throwing an iPad, "flip[ping] the bird," shaking his fist, or yelling profanities at Horton.

According to Chad, Horton then slowed down and started to veer back but continued to follow them. Chad agreed that his father was trying to avoid "two black semis" that were following them but admitted that Horton did not attempt to overtake them and that it was "very possible" Horton was trying to get home. Chad further testified that Horton did not pull over and was not showing any fear or backing down. Chad answered yes when asked (1) if Horton had continued "to pursue" the pickup and (2) if he was then "in fear for [his] safety."

18

Although Windham had asked Chad to call the police, Chad testified that he could not because he was "in shock" and "terrified" and "[n]othing was working." Chad further testified that they were in "heavy traffic" and that he did not notice any exits from the highway that would be easy to take with a big pickup pulling a huge boat. According to Chad, it was not easy for Windham to change lanes while hauling the boat; the boat would fishtail if they went above sixty-five or seventy miles per hour. Chad did not notice any rest stops on his side of the highway, and the shoulder was not wide enough to pull the pickup and boat off the road. He could not recall if there were other places to pull over and call the police.

Chad admitted that he did not tell the officers that his father had a gun; the deputies had recovered the gun as soon as they pulled them over. Chad also admitted that neither he nor his father told the police the truth. Chad said that when his father told him not to "be fuzzy," he was talking about "when he produced that pistol and threatened Mr. Horton with it."

Chad said that when he got home, he told his mother about his father's displaying the weapon. His father called from jail later that day. The trial court admitted the recording of the call into evidence. In that call, Windham asked his wife whether Chad and Chance had told her what had happened, and she responded, "You . . . lost your temper and showed [the] gun." Windham replied, "Yeah. . . . I mean the guy tried to kill us." When speaking to his other son Chance, Windham said, "I messed up." Chad, on the other hand, did not think that his father had messed up.

19

### 7.    Windham

Windham testified that on the flyover, he was in the middle of three lanes (lane 2) and that Horton's tractor-trailer was in lane 1. Windham changed into lane 1 in front of Horton's tractor-trailer, passed a slower automobile, and then moved back into lane 2. Windham then saw Horton's tractor-trailer accelerating and coming over; a red truck was in the far-right lane (lane 3). Windham's pickup "touch[ed]" the red truck; Windham claimed that Horton "drove us all the way over there and [that he, Windham,] did a remarkable job of not tearing that highway up with everybody out there." Windham testified that there was also a second semi-truck behind him during this incident with the red truck but that he had no reason to believe that it was Williams's tractor-trailer:

> Q.    All right. So [Horton] slowed down?
>
> A.    Yes. We all slowed down, all three of us, even the red truck. . . . . And there was also a truck behind me.
>
> Q.    A semi truck behind you?
>
> A.    Yes, sir.
>
> Q.    So you were kind of boxed in where nobody could see you?
>
> A.    Correct.

According to Windham, the red truck exited the highway, and Horton then went back to the middle lane. At that point, the highway went down to two lanes, and Horton was in front of him. Horton had slowed down to about forty miles per hour.

Next, Windham slowed down and moved to the far-left lane (lane 1). According to Windham, both he and Horton sped up initially, but Horton slowed down when they reached a point in the road where there was a guardrail to Windham's left:

Q.   [Both of you] are speeding back up?

A.   Yes. And then we got to about 60 miles per hour and he slows down. He's coming back now, again. And there's a guard rail.

Q.   A guard rail on your – your left?

A.   Yes.

Q.   All right.

A.   There's no shoulder and a guard rail there.

Q.   All right. Did that concern you?

A.   I thought here he's – he's coming again.

Q.   He'd already tried to push you off –

A.   He'd already damn near killed all three of us.

     . . . .

Q.   . . . . So tell me why you were concerned about the guard rail on your left.

A.   I had no place to go. It's just gonna be a big mess.

Q.   And you thought he was coming up to –

A.   He'd already done it once.

Q.   Okay. Were you in fear for your life?

A.   Yes, sir.

Q.   Were you in fear for your children's lives?

21

A.    I was in fear for them first.

Q.    All right. So what did you do?

A.    Uh, I grabbed my gun out of the console and held it between my boy's legs, like this. I didn't – I didn't grip it. I had it between these three fingers and my thumb, and I shook it like that. (Gesturing)

Q.    Did you ever point it at him?

A.    I did not point that gun at that man.

      . . . .

Q.    Okay. Why did you show the gun to him?

A.    I wanted him to know that I could protect me and my – my family and my property.

Q.    Were you trying to – Were you making a statement?

A.    I was wanting him to go away and leave us alone. He was in road rage, and he was driving that truck dangerously for all of us.

Q.    So what happened then?

A.    He slowed down and continued to stay behind me from then on.

In further explanation of this incident, Windham testified that after he resumed driving the speed limit, Horton slowed and was "coming back at [him], and [the pickup was] up against the guard rail." Windham added, "He slowed down, took a look. . . . I thought he was coming at us again, but he wanted to see how big our eyes were. That's how he looked."

Windham said that when he produced the gun, he was between Horton and a guardrail and was still in fear for his safety. Windham felt justified in producing and

22

displaying the gun because he had done so in self-defense. However, he denied "us[ing] a firearm to intimidate and threaten another human being" on the day at issue.

Windham also admitted that Horton took no aggressive action toward him after he produced the gun, that he "never saw two big black trucks bearing down on [him] the whole time," and that he had lied to Trooper Wolf about not having displayed a weapon.

Windham testified that he did not notice any places to exit from the highway that he could have taken easily but that he was just watching Horton's tractor-trailer. The shoulder was not wide enough to pull the boat over. Horton's tractor-trailer was bigger than Windham's pickup, and Windham could not easily accelerate with the boat.

According to Windham, when he told Chance that he had "messed up," he meant that he had messed up by not calling 911 because that was the reason Trooper Wolf gave for arresting him.

## C.    Discussion

Windham asserts that this evidence is insufficient to prove beyond a reasonable doubt that he committed aggravated assault with a deadly weapon because he merely displayed the gun and never pointed it at Horton and because Horton was not actually threatened by his actions. Windham's arguments invite us to view the evidence in the

light most favorable to the defensive evidence, contrary to the prescribed standard of review. Therefore, neither argument is persuasive.

### 1. No material variance

Windham challenges whether the evidence shows that he pointed the gun at Horton, as alleged in the indictment. According to Windham, the evidence does not prove that he actually pointed the gun at Horton; therefore, there is a material variance between the allegations in the indictment and the proof at trial, rendering the evidence insufficient. *See Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001) (holding that evidence presented at trial that varies from indictment's wording will not support conviction if the variance is material and prejudices defendant's substantial rights).

Horton testified that Windham pointed the gun at him and that he was looking down the barrel of the gun, which was "pointing up at [him] from inside the" pickup. Dash-cam video showed Horton demonstrating shortly after the incident how Windham had displayed the weapon; Horton's arm was extended directly from the shoulder in a pointing motion.

Although Windham challenges on appeal how reasonable it was for a jury to believe that Horton could have actually seen into the pickup, Horton testified at trial that his seat rode higher than the seats in the pickup and that he was elevated. Windham offered no explanation at trial as to how Horton could have accurately described to the 911 operator that the gun was a "black-blue revolver" before the

officers stopped Windham and found the weapon. The jury was free to believe or disbelieve any or all aspects of Horton's and Windham's version of events. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. Therefore, the jury was not required to believe Windham's testimony that he merely produced the gun and held it so that Horton could see it.

The evidence was sufficient to support a finding that Windham pointed the gun at Horton; thus, there is no material variance between the indictment and the proof at trial. *See, e.g.*, *Alexander v. State*, No. 02-18-00070-CR, 2019 WL 4048864, at *4 (Tex. App.—Fort Worth Aug. 28, 2019, no pet.) (mem. op., not designated for publication) (determining that conviction was not infirm for lack of sufficient evidence under *Jackson* when evidence at trial and wording of indictment did not vary).

## 2. Evidence that Horton perceived threat

To support his argument that he did not threaten Horton with imminent bodily injury, Windham focuses on the trial testimony and dash-cam footage showing that Horton had told Trooper Wolf shortly after the incident that he felt "pissed" but did not "figure [Windham] was going to shoot." Citing no authority, Windham argues that an "essential element [of aggravated assault with a deadly weapon by threat] is that the [c]omplainant feared imminent bodily injury." He then argues that it was impossible that Horton "could have interpreted [Windham's] actions in . . . a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility" and that Horton was "neither fearful nor 'threatened.'"

25

Although Section 22.01(a)(2) "does not explicitly indicate whether the intended victim must perceive or receive the threat" and although the Court of Criminal Appeals has not affirmatively interpreted Section 22.01(a)(2) as requiring that a victim perceive the threat, neither has it expressly held that the statute does not require such a perception. *Olivas v. State*, 203 S.W.3d 341, 345, 349 (Tex. Crim. App. 2006); *see Boston v. State*, 410 S.W.3d 321, 326 (Tex. Crim. App. 2013). Instead, it has broadly defined the term perceive as "[t]o become aware of directly through the senses[,] . . . [t]o take notice of[,] . . . [t]o achieve understanding of." *Boston*, 410 S.W.3d at 326. In so doing, it has held that the victim does not have to perceive the exact nature of the threat and that varied types of evidence can prove the perception of a threat: evidence that the victim feared he could be injured in some way, evidence that the victim perceived an offense had occurred, and evidence of the defendant's prior actions that affected the victim's state of mind at the time of the charged offense. *See Boston*, 410 S.W.3d at 327; *Olivas*, 203 S.W.3d at 350–51.

Here, viewed in the light most favorable to the verdict, the evidence showed that Windham lost his temper, drove beside Horton on the tractor-trailer's driver's side, and pointed his gun at Horton from inside the pickup. Horton testified that he saw the barrel end of the gun and that it was Windham who was pointing the gun at him. The gun was fully loaded when Trooper Wolf secured it. Windham himself testified that he produced the gun to show that he could protect himself, his family,

26

and his property and so that Horton would "go away and leave [Windham and his family] alone."

Moreover, Horton did, in fact, testify that he felt threatened by Windham's actions and that he took steps to avoid being shot after he saw the gun; he leaned back to avoid the potential line of fire and let Windham pass him. To the extent that what Horton told the officers during the traffic stop—that he was simply angry about Windham's pointing the gun and that he did not think Windham would actually shoot the gun—conflicts with his trial testimony that he felt threatened, the jury was entitled to resolve any such conflict and determine which testimony to believe. *See Murray*, 457 S.W.3d at 448–49; *Schmidt v. State*, 232 S.W.3d 66, 68 (Tex. Crim. App. 2007).

We conclude that this evidence is sufficient for a rational jury to find beyond a reasonable doubt that Windham threatened Horton with imminent bodily injury.[9] *See* Tex. Penal Code Ann. § 22.01(a)(2); *Olivas*, 203 S.W.3d at 346–49. Thus, we hold that the evidence is sufficient to prove beyond a reasonable doubt that Windham

---

[9]In his second issue, Windham argues that we should render a judgment of acquittal because the evidence would have been insufficient if the trial court had given his requested defensive instructions. Although we may review the sufficiency of the jury's rejection of self-defense when the trial court gives such an instruction, *see Saxton v. State*, 804 S.W.2d 910, 913–14 & n.8 (Tex. Crim. App. 1991), we question whether such a review is appropriate when the trial court has not given such an instruction, *see Taylor v. State*, No. 05-02-01178-CR, 2003 WL 21508785, at *3 (Tex. App.—Dallas July 1, 2003, no pet.) (not designated for publication). However, because the standard of review articulated in *Saxton* focuses on whether the State proved its case beyond a reasonable doubt despite the defensive evidence, thus incorporating a *Jackson* review, Windham would not be entitled to an acquittal based on our review of all the evidence in resolving his first issue. *See Saxton*, 804 S.W.2d at 914 (citing *Jackson*).

committed aggravated assault by threat with a deadly weapon. We overrule Windham's first and second issues.[10]

## IV. SELF-DEFENSE

In Windham's third and fourth issues, he complains that the trial court reversibly erred by denying his requested deadly-force and nondeadly-force self-defense jury instructions under Penal Code Sections 9.04 and 9.32.

### A. Standard of Review

Appellate review of error in a jury charge involves a two-step process. *Trammell v. State*, 287 S.W.3d 336, 340 (Tex. App.—Fort Worth 2009, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). Initially, we determine whether error occurred; if so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32. The standard of review for jury-charge error depends on whether the error was preserved. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020). Because Windham preserved his jury-charge complaints by requesting instructions, we review any error for "some harm." *Id.*; *see also* Tex. Code Crim. Proc. Ann. art. 36.15; *Francis v. State*, 36 S.W.3d 121, 123 (Tex. Crim. App. 2000).

---

[10]Because we conclude that the evidence is sufficient to support Windham's conviction for aggravated assault, we do not reach Windham's alternative argument that he was at most guilty of deadly conduct. *See* Tex. R. App. P. 47.1.

A defendant is entitled to a self-defense instruction when that defensive issue is raised by the evidence, "whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). In reviewing the denial of a requested self-defense instruction, we view the evidence in the light most favorable to the requested submission to determine whether evidence from any source will support the elements of the defense. *Id.*; *see also Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013) ("[E]ven a minimum quantity of evidence is sufficient to raise a defense as long as the evidence would support a rational jury finding as to the defense.").

## B. Applicable Law on Self-defense

Under Section 9.31 of the Texas Penal Code, a person is justified in using nondeadly force when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force, except in the limited circumstances provided in Section 9.31(b).[11] *See*

---

[11]The only potentially applicable exception in Subsection (b) on the facts of this case is Section 9.31(b)(4), which provides that the threat of force against another is not justified if the actor provoked the other's use or attempted use of unlawful force, unless (A) the actor abandons the encounter or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter and (B) the other nevertheless continues or attempts to use unlawful force against the actor. Tex. Penal Code Ann. § 9.31(b)(4). Neither Windham nor the State contends that the evidence suggests that Windham provoked any use or attempted use of unlawful force by Horton. Thus, we do not address the applicability of Section 9.31(b)(4).

Tex. Penal Code Ann. § 9.31(a); *Gamino*, 537 S.W.3d at 510. Similarly, under Penal Code Section 9.32, a person is justified in using deadly force if he would be justified in using force under Section 9.31 and he reasonably believes that deadly force is immediately necessary to protect himself against another's use or attempted use of deadly force. *See* Tex. Penal Code Ann. § 9.32(a)(1)–(2)(A); *Trammell*, 287 S.W.3d at 341; *see also* Tex. Penal Code Ann. § 9.01(3) (defining "deadly force" as force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury"). A "reasonable belief" is "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(a)(42).

Deadly-force self-defense may not apply to the tried facts even if a defendant is charged with using or displaying a deadly weapon. *Gamino*, 537 S.W.3d at 510. That is because under Penal Code Section 9.04, "a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force." Tex. Penal Code Ann. § 9.04. Because Section 9.04 provides that "[t]he threat of force is justified when the use of force is justified by [the self-defense] chapter" of the Penal Code, Section 9.04 is not a separate statutory defense; it is incorporated into the law of self-defense. *Gamino*, 537 S.W.3d at 510. Thus, even though Windham was charged with using a deadly weapon, if the evidence presented at trial triggered the application of Section 9.04, he would be

30

entitled to an instruction on nondeadly force under Section 9.31, rather than an instruction on deadly-force self-defense under Section 9.32. *See id.*

Windham requested self-defense instructions under Sections 9.04, 9.31, and 9.32. Therefore, to be entitled to a self-defense instruction, Windham was required to present some evidence at trial triggering the application of Sections 9.04 and 9.31 (nondeadly force) or Section 9.32 (deadly force). *See Gamino*, 537 S.W.3d at 510.

In his brief, Windham focuses largely on the trial court's refusal to give a deadly-force self-defense instruction under Section 9.32, but in his fourth issue he also argues that the evidence triggered Section 9.04. Because Section 9.04 is not a stand-alone provision and incorporates Section 9.31 in the nondeadly-force context, we construe Windham's fourth issue as fairly including an argument that the trial court erred by refusing his requested self-defense instruction under both Section 9.04 and Section 9.31. *See* Tex. R. App. P. 38.1(f); *see also Gamino*, 537 S.W.3d at 511 n.17 ("Logically, therefore, if Section 9.04 is triggered by the evidence presented, and if the defendant requests a self-defense instruction, then Section 9.04 and Section 9.31 would be the 'law appliable to the case.'"). Accordingly, we first review whether the trial court erred by denying Windham's requested self-defense instruction under Penal Code Sections 9.04 and 9.31. *See Gamino*, 537 S.W.3d at 510–11 (noting, as court of appeals had held, that if "Section 9.04 applies, then the use of a gun does not constitute 'deadly force,' and, therefore, [S]ection 9.32 would become inapplicable" because "the use of the gun would, by default, be the use of 'force' in self[-]defense,

31

and [S]ection 9.31 would be the applicable provision" (quoting *Gamino v. State*, 480 S.W.3d 80, 87 (Tex. App.—Fort Worth 2015))).

## C. Evidence Raised Self-defense

Windham argues that the evidence shows (1) that he displayed the weapon only to create an apprehension that he would use deadly force if necessary to protect himself and (2) that he reasonably believed that such force was immediately necessary to protect himself from Horton's use or attempted use of unlawful force. According to Windham, this evidence was sufficient to support submission of a self-defense instruction. The State counters—as it did at trial—that "no evidence shows any immediate necessity justifying Windham's illegal act" and that Windham was not entitled to the instruction because he did not confess to pointing the gun at Horton as alleged in the indictment. We agree with Windham.

### 1. The confession-and-avoidance requirement

The State first contends that Windham was not entitled to a self-defense instruction because he did not admit that he pointed a gun at Horton as alleged in the indictment. Self-defense is a confession-and-avoidance defense; therefore, a defendant "cannot both invoke self-defense and flatly deny the charged conduct." *Jordan*, 593 S.W.3d at 343. However, an appellant is not required to admit the State's version of events and does not necessarily have to admit committing every element of the offense. *Gamino*, 537 S.W.3d at 512. Moreover, even an equivocal admission can raise a defense. *See Juarez v. State*, 308 S.W.3d 398, 405–06 (Tex. Crim. App. 2010); *see also*

32

*Bufkin v. State*, 207 S.W.3d 779, 781–82 (Tex. Crim. App. 2006) (noting that while "[i]t is certainly true that the defendant cannot foist upon the State a crime the State did not intend to prosecute in order to gain [a defensive] instruction," nevertheless, "the defendant has the right to controvert the facts upon which the prosecution intends to rely, and that right includes claiming that the events unfolded in a way different than the State has alleged"). Therefore, Windham was not required to specifically admit that he pointed the firearm directly at Horton; instead, he was entitled to a Section 9.04 and 9.31 instruction

> if there [was] some evidence, even if contradicted, that he believed the display of his gun was immediately necessary to protect himself against the victim's use or attempted use of unlawful force, that his purpose in displaying his weapon was limited to creating an apprehension that he would use deadly force if necessary, and that his conduct was not in response to verbal provocation alone.

*Gamino*, 537 S.W.3d at 512.[12]

Windham testified that after the first incident where he alleged Horton had tried to push his vehicle off the road that he thought Horton was "coming again."

---

[12]*Isaacson v. State*, an unpublished case from the Austin Court of Appeals, does not command a different result. No. 03-10-00866-CR, 2013 WL 1955799 (Tex. App.—Austin May 10, 2013, pet. ref'd) (mem. op., not designated for publication). The State points out that the way we distinguished *Isaacson* in our opinion in *Gamino* shows that the reasoning of *Isaacson* controls here. We do not agree because not only did *Isaacson* predate the Court of Criminal Appeals's decision in *Gamino*—which did not discuss or rely upon our distinguishing *Isaacson* in the underlying opinion—the defendant in *Isaacson* was charged with aggravated assault on a public servant and admitted only to answering his front door while holding a gun by his side, pointed at the ground, without any knowledge that the people at his door were police officers. 2013 WL 1955799, at *3. Thus, *Isaacson* is distinguishable, and we do not find its reasoning persuasive.

33

This second time, Windham was driving in the left-hand lane with no shoulder on the road to his left, only a guardrail. According to Windham, he perceived that Horton was going to try to pin his pickup against the guardrail; if Horton had done so, Windham would have "had no place to go," and the result would have been "a big mess." Windham testified that, fearing for his life and the lives of his children, he "grabbed [his] gun out of the console" and showed it to Horton. Windham explained that his purpose in displaying the gun was to let Horton know that he could protect himself, his family, and his property in the hope that Horton would "go away and leave [them] alone." And, again according to Windham, after he brandished the gun, Horton "slowed down and continued to stay behind [him] from then on."

While Windham denied committing an offense, he said his purpose in holding the gun where Horton could see it was to *prevent* an offense. This defensive evidence is some evidence that Windham believed it was immediately necessary to display his gun to prevent Horton's attempted use of force, that Windham showed the gun solely to create the apprehension that he would use it if necessary, and that his use of the gun was not solely in response to verbal provocation; thus, this evidence was sufficient to satisfy the confession-and-avoidance prerequisite to obtaining a self-defense instruction.[13] *See Gamino*, 537 S.W.3d at 512–13.

---

[13]Even if the jury believed Windham's testimony only in part—if it rejected his testimony that he did not point the gun at Horton, believing that he did point the gun at Horton, but also believing Windham's testimony that he did so only because he was afraid that Horton was attempting to pin him in between the tractor-trailer and the

## 2.    Evidence regarding imminent harm disputed

Windham next argues that he was entitled to a self-defense instruction because some evidence shows that he believed his display of the gun was immediately necessary. The State argued at trial, and argues on appeal, that Windham's conduct could not have been immediately necessary to protect himself from imminent harm because the evidence shows that after Windham and Chad claimed to have had the near-collision with the red truck, Windham had ended up behind Horton in lane 2 and to reach Horton's driver's side window had to have deliberately moved into the left lane and accelerated. Therefore, the State contends that Windham could have avoided the next encounter—in which Windham drove up beside the driver's side of Horton's tractor-trailer on the left and either pointed or displayed the gun—altogether by simply remaining behind Horton and letting him get ahead or exiting the highway. At trial, the State cited this court's *Trammell* opinion as controlling on this point, and the trial court agreed. 287 S.W.3d at 340–42.

"[I]imminent harm is harm that is ready to take place—harm that is coming in the very near future. Logically, then, if conduct is 'immediately necessary' to avoid harm that is imminent, that conduct is needed right now." *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016). Thus, in the self-defense context, "force that is 'immediately necessary' to protect oneself or another from a person's use of unlawful

---

guardrail—the jury could find that Windham was acting in self-defense under Sections 9.04 and 9.31.

force is force that is needed at that moment—'when a split[-]second decision is required.'" *Id.* at 90 (quoting *Smith v. State*, 874 S.W.2d 269, 273 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd), *abrogated on other grounds by Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

In *Trammell*, an aggravated assault case, several hours had passed between the complainant's threatening the appellant with a knife and the appellant's shooting the complainant. 287 S.W.3d at 337–38. The appellant had left the scene after the knife incident, only to return hours later to sit in a parked car in front of the complainant's home. *Id.* at 337. While sitting in the parked car, appellant shot the complainant after the complainant had driven over to appellant's car and spoken to him through the open windows. *Id.* at 337–39, 341. There was no evidence that the complainant had threatened the appellant physically after the complainant came out of his house and before the appellant shot him. *Id.* at 337–38, 341. We therefore rejected the appellant's argument that he was entitled to a self-defense instruction because the "appellant could have simply driven away from the scene; shooting the gun was not an immediately necessary response." *Id.* at 341.

Here, though, there is some evidence that Windham believed Horton was threatening him and his sons with imminent bodily injury—trying to pin their pickup against a guardrail while driving at high speed—when Windham pulled out his gun. However, the State claims that the evidence is undisputed that Windham, like the

36

defendant in *Trammell*, could have avoided the situation altogether by not driving past Horton. The evidence is not undisputed on this point, though.

Windham testified that he and Horton were driving in rush-hour traffic and that it was difficult to maneuver the pickup with the boat attached. After the near-collision, Horton and Windham both accelerated back to about sixty miles per hour. Although Windham was in the left lane and Horton in lane 2, Horton was ahead of Windham. While the State and trial judge both characterized the evidence as showing only that Windham had sped up to reach Horton's tractor-trailer, that evidence came from Horton alone. Chad and Windham both testified that Horton slowed his tractor-trailer, thus causing Windham to pull even with the tractor-trailer, and Windham testified that Horton's slowing down, combined with his prior action in forcing Windham's pickup into the red truck, caused Windham to think that Horton was going to try to pin the pickup between the tractor-trailer and the guardrail. Thus, not only was the evidence about how Windham and Horton ended up next to each other disputed, contrary to the State's argument, the State's position ignores that we are to view the evidence—whether it is contradictory or weak—in the light most favorable to Windham in determining whether the trial court should have given an instruction. *See Gamino*, 537 S.W.3d at 510.

The facts in this case are distinguishable from the facts in *Trammell*.[14] Windham and Horton were both driving large vehicles through rush-hour traffic. There is some evidence that Windham, perceiving that the threat of being pushed off the road had ended, attempted to drive in the flow of traffic, albeit in a different lane from Horton, but that after Windham could no longer take effective evasive action, Horton slowed down so that he was even with Windham, which in light of Horton's prior actions Windham perceived as a threat to pin him against the guardrail. Whether Windham's moving into the left lane (where he could be put in the defensive position he claimed he was in) and his belief that Horton was attempting to use unlawful force against him were reasonable under the circumstances is a fact question for the jury to decide and not a preliminary question for the trial court to resolve when determining whether the defense was raised. *See Gamino*, 480 S.W.3d at 90.

Viewing the evidence in the light most favorable to Windham, there is some evidence that the above-described circumstances imposed a threat of bodily harm to

---

[14]Three of the cases cited by the State are factually distinguishable because in those cases, there was no evidence that the complainants were doing anything to threaten the appellants or third persons with imminent harm when the appellants used the force at issue. *See Henley*, 493 S.W.3d at 89–90; *Graves v. State*, 452 S.W.3d 907, 911–12 (Tex. App.—Texarkana 2014, pet. ref'd); *McBride v. State*, 359 S.W.3d 683, 694–95 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Two of the cases are procedurally distinguishable because the trial court *did* include a self-defense instruction, and the focus on appeal was whether the evidence nevertheless supported the jury's verdict. *See Hernandez v. State*, No. 04-18-00217-CR, 2019 WL 1547493, at *1–2, *4 (Tex. App.—San Antonio Apr. 10, 2019, no pet.) (mem. op., not designated for publication); *Guerrero v. State*, No. 14-13-00880-CR, 2014 WL 3955157, at *1–2 (Tex. App.—Houston [14th Dist.] Aug. 14, 2014, pet. ref'd) (mem. op., not designated for publication).

Windham that was "ready to take place, near at hand, impending, hanging threateningly over [his] head, [or] menacingly near." *See Henley*, 493 S.W.3d at 89. Accordingly, the trial court erred by refusing Windham's Section 9.04 and 9.31 self-defense instructions.

**D.    Some Harm**

When, as in this case, a defendant preserves a charge-error complaint, the error requires reversal if the error caused "some harm," meaning it was "calculated to injure the rights of [the] defendant." *See* Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor*, 871 S.W.2d at 732; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). "Some harm" means "any harm, regardless of degree," *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986), but it also means "actual harm and not merely a theoretical complaint," *Jordan*, 593 S.W.3d at 347; *Arline*, 721 S.W.2d at 351. To assess harm, we must evaluate the whole record, including the jury charge, contested issues, weight of the probative evidence, arguments of counsel, and other relevant information. *Jordan*, 593 S.W.3d at 347.

We conclude that the record in this case demonstrates some harm. Windham testified that he showed the gun to Horton to make Horton leave him and his sons alone. Although the jury had to decide which version of events to believe—Horton's or Windham's—even if it had believed Windham's version it could have convicted him under the jury charge it received. Windham's entire defense was built around his

39

justification based on self-defense and defense of his sons; he set out this theme as early as his opening statement. *See Gamino*, 480 S.W.3d at 91 ("Under the charge given to the jury, Appellant lost under both versions because Appellant's use of a gun constituted the unwarranted use of deadly force. Nothing in the charge provided that Appellant's conduct might have been justified or excused for any reason."). In closing argument, the State asserted that there was no dispute that Windham purposefully picked up the gun and emphasized that Windham did what he did because he was angry; in other words, he had no excuse. Accordingly, we hold that Windham suffered some harm, and we sustain his fourth issue. We need not reach his third and fifth issues. *See* Tex. R. App. P. 47.1; *Gamino*, 480 S.W.3d at 92.

## V. CONCLUSION

Having overruled Windham's first and second issues and having sustained his fourth issue, we reverse the trial court's judgment and remand this case for a new trial. *See Arteaga v. State*, 521 S.W.3d 329, 340 (Tex. Crim. App. 2017) ("The normative remedy for harmful jury charge error is to reverse the convictions and remand for a new trial.").

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  February 4, 2021